# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP594-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, <br>        Plaintiff-Respondent, <br>     v. <br> Leevan Roundtree, <br>        Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 387 Wis. 2d 685,928 N.W.2d 806
(2019 – unpublished)

| | |
|---|---|
| OPINION FILED: | January 7, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 11, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | William S. Pocan & David A. Hansher |

JUSTICES:

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, DALLET, and KAROFSKY, JJ., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion. HAGEDORN, J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Kaitlin A. Lamb* assistant state public defender. There was an oral argument by *Kaitlin A. Lamb*.

For the plaintiff-respondent, there was a brief filed by *Sarah L. Burgundy,* assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sarah L. Burgundy*.

No.   2018AP594-CR
(L.C. No.  2015CF4729)

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

STATE OF WISCONSIN                    :        IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

    **v.**

**Leevan Roundtree,**

      **Defendant-Appellant-Petitioner.**

**FILED**

JAN 7, 2021

Sheila T. Reiff
Clerk of Supreme Court

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, DALLET, and KAROFSKY, JJ., joined.  DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.  REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.  HAGEDORN, J., filed a dissenting opinion.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1   ANN WALSH BRADLEY, J.   The petitioner, Leevan Roundtree, seeks review of an unpublished per curiam decision of the court of appeals affirming his judgment of conviction and

the denial of his motion for postconviction relief.[1] He asserts that the felon-in-possession statute under which he was convicted is unconstitutional as applied to him.

¶2 Specifically, Roundtree contends that Wisconsin's lifetime firearm ban for all felons is unconstitutional as applied to him because his conviction over ten years ago for failure to pay child support does not justify such a ban. He maintains that the conviction was for a nonviolent felony and that no public safety objective is served by preventing him from owning a firearm.

¶3 The parties disagree as to the level of scrutiny that we should employ to resolve this constitutional challenge. Roundtree advances that we should subject the statute to the requirements of a strict scrutiny review. The State counters that the application of intermediate scrutiny is consistent with precedent.

¶4 We determine that Roundtree's challenge to the felon-in-possession statute (Wis. Stat. § 941.29(2) (2013-14)[2]) requires the application of an intermediate level of scrutiny.

---

[1] State v. Roundtree, No. 2018AP594-CR, unpublished slip op. (Wis. Ct. App. Apr. 4, 2019) (per curiam) (affirming the judgment and order of the circuit court for Milwaukee County, William S. Pocan and David A. Hansher, Judges).

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

Although Roundtree was convicted pursuant to Wis. Stat. § 941.29(2), that subsection has since been repealed, with the substance of the former § 941.29(2) now residing in Wis. Stat. § 941.29(1m) (2017-18). See 2015 Wis. Act 109, §§ 6, 8.

Under such an intermediate scrutiny analysis, we conclude that his challenge fails.  The statute is constitutional as applied to Roundtree because it is substantially related to important governmental objectives, namely public safety and the prevention of gun violence.

¶5  Accordingly, we affirm the decision of the court of appeals.

I

¶6  In 2003, Roundtree was convicted of multiple felony counts of failure to support a child for more than 120 days.[3]  As a consequence of these felony convictions, Roundtree was, and continues to be, permanently prohibited from possessing a firearm.

¶7  Milwaukee police executed a search warrant at Roundtree's home on October 30, 2015.  Under his mattress, officers located a revolver and ammunition.  A record check of the recovered gun revealed that it had been stolen in Texas.  Roundtree claimed that "he purchased the firearm from a kid on the street about a year ago, but that he did not know it was stolen."

¶8  The State charged Roundtree with a single count of possession of a firearm by a felon contrary to Wis. Stat. § 941.29(2).  He pleaded guilty and was subsequently sentenced to 18 months of initial confinement and 18 months of extended supervision.

---

[3] See Wis. Stat. § 948.22(2) (2003-04).

3

¶9 Roundtree moved for postconviction relief, arguing that Wis. Stat. § 941.29(2), the felon-in-possession statute, was unconstitutional as applied to him. The circuit court held the motion in abeyance pending the United States Supreme Court's decision in Class v. United States, 138 S. Ct. 798, 803 (2018), which determined that a federal criminal defendant does not waive a constitutional challenge to the statute of conviction on direct appeal by entering a guilty plea.[4]

¶10 After the issuance of the Class opinion, the circuit court ultimately determined that Roundtree waived his constitutional challenge by entering a guilty plea. Consequently, the circuit court denied Roundtree's motion for postconviction relief.[5]

¶11 Roundtree appealed, and the court of appeals affirmed, albeit on different grounds. State v. Roundtree, No. 2018AP594-CR, unpublished slip op. (Wis. Ct. App. Apr. 4, 2019) (per curiam). Instead of resting on the guilty plea waiver rule, the court of appeals determined that "regardless of whether Roundtree forfeited the constitutional argument by entering a guilty plea, . . . the argument fails on its merits." Id., ¶5.

---

[4] The "guilty plea waiver rule" refers to the general rule that a guilty, no contest, or Alford plea waives all nonjurisdictional defects, including constitutional claims. State v. Kelty, 2006 WI 101, ¶18, 294 Wis. 2d 62, 716 N.W.2d 886; see North Carolina v. Alford, 400 U.S. 25 (1970).

[5] The order denying the postconviction motion was entered by the Honorable David A. Hansher. The Honorable William S. Pocan accepted Roundtree's plea and entered the judgment of conviction.

4

By way of explanation on the merits, the court of appeals expounded, "Roundtree's notion that his particular nonviolent felony matters is incorrect. Rather, it is settled law that the firearm ban applies regardless of the defendant's particular felony." Id., ¶7. Like the court of appeals, we, too, determine that Roundtree's argument fails on its merits, and therefore we need not address whether he waived his constitutional challenge.[6]

II

¶12 Roundtree asks us to review whether Wis. Stat. § 941.29(2) is unconstitutional as applied to him. Examining the constitutional application of a statute presents a question of law that this court reviews independently of the determinations rendered by the circuit court or court of appeals. State v. McGuire, 2010 WI 91, ¶25, 328 Wis. 2d 289, 786 N.W.2d 227.

¶13 In our review, we must also determine the appropriate level of scrutiny to guide our analysis. This issue likewise presents a question of law that we determine independently. See

---

[6] Roundtree contends that Wisconsin's use of the guilty plea waiver rule was altered by the Court's recent decision in Class v. United States, 138 S. Ct. 798 (2018). The Class Court determined that a guilty plea by itself does not bar a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal. Id. at 803. Roundtree asserts that, like the defendant in Class, he should be allowed to challenge the government's power to criminalize his conduct in spite of his guilty plea. The State disagrees, arguing that Class applies in federal court only and that it does not extend to as-applied challenges.

_Brandmiller v. Arreola_, 199 Wis. 2d 528, 536-37, 540-41, 544 N.W.2d 894 (1996).

### III

¶14 We begin by setting forth Roundtree's argument and some necessary background regarding the individual right to bear arms. Subsequently, we determine the level of scrutiny under which we examine the felon-in-possession statute. Finally, we apply the appropriate level of scrutiny.

### A

¶15 Roundtree was convicted of possession of a firearm by a felon contrary to Wis. Stat. § 941.29(2)(a), which provides that a person convicted of a felony in this state "is guilty of a Class G felony if he or she possesses a firearm under any of the following circumstances . . . ." The circumstance applicable here is that "[t]he person possesses a firearm subsequent to the conviction for the felony or other crime, as specified in sub. (1)(a) or (b)." § 941.29(2)(a).

¶16 This statute, as Roundtree correctly observes, bars a person convicted of any felony from firearm possession after that conviction without exception, with no time limitation, and with no mechanism for restoration of the right to possess a firearm. The statute does not draw any distinctions among felonies. Those convicted of less serious felonies are banned from possessing firearms just as are those convicted of the most serious felonies.

¶17 In Roundtree's estimation, this statutory scheme is unconstitutional as applied to him. There are two major types

of constitutional challenges:  facial and as-applied.  Michels v. Lyons, 2019 WI 57, ¶11, 387 Wis. 2d 1, 927 N.W.2d 486.  A party challenging a law as unconstitutional on its face must show that the law cannot be constitutionally enforced under any circumstances.  Id. (citation omitted).

¶18  In contrast, in an as-applied challenge, the court assesses the merits of the challenge by considering the facts of the particular case before it.  State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63.  For an as-applied challenge to succeed, the challenger must demonstrate that the challenger's constitutional rights were actually violated.  Id.  If such a violation occurred, the operation of the law is void as to the facts presented for the party asserting the claim.  Id.  We presume that the statute is constitutional, and the party raising a constitutional challenge must prove that the challenged statute has been applied in an unconstitutional manner beyond a reasonable doubt.  Id., ¶15.

¶19 Roundtree's as-applied challenge is based on the contention that his conviction for failure to pay child support is a nonviolent felony and thus is insufficient to curtail his constitutional right to bear arms.  He argues that "[d]isarming [him] does not in any way advance public safety, but deprives him of his right to keep and bear arms for self-defense."  As this is an as-applied challenge, he must demonstrate that his constitutional rights specifically were violated, not that the statute is unconstitutional in all applications.

7

B

¶20 We begin our assessment of Roundtree's claim with some background on the right to bear arms. Both the United States and Wisconsin Constitutions provide for this right. U.S. Const. amend. II; Wis. Const. art. I, § 25.[7]

¶21 The United States Supreme Court has made clear that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." District of Columbia v. Heller, 554 U.S. 570, 626 (2008). The same is true of the right provided by our State Constitution. Moran v. DOJ, 2019 WI App 38, ¶48, 388 Wis. 2d 193, 932 N.W.2d 430. Indeed, the Second Amendment secures "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635.

¶22 In Heller, the Court struck down a regulation barring residential handgun possession as contrary to the Second Amendment. Id. In doing so, the Court observed "that the Second Amendment conferred an individual right to keep and bear arms." Id. at 595. It was careful, however, to delineate the reach of its analysis:

> [N]othing in our opinion should be taken to cast doubt
> on longstanding prohibitions on the possession of
> firearms by felons and the mentally ill, or laws
> forbidding the carrying of firearms in sensitive

---

[7] The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Its Wisconsin counterpart, art. I, § 25, sets forth: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose."

> places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27.

¶23 The Court identified such regulations as "presumptively lawful," id. at 627 n.26, and reiterated the same assessment two years later in McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) ("We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here.") (internal citations omitted).

¶24 It is the juxtaposition of the United States Supreme Court's stated limitations on the Second Amendment individual right to bear arms, as well as the felon-in-possession statute's presumed lawfulness, that guides our analysis.

IV

A

¶25 With this necessary background in hand, we next identify the appropriate level of scrutiny that frames our analysis.

¶26 The parties here disagree as to the level of means-end scrutiny that should be applied. Roundtree contends that we should subject Wis. Stat. § 941.29(2) to strict scrutiny. He bases this argument on language in the Seventh Circuit's

9

decision in Ezell v. City of Chicago which indicates that "the rigor of . . . judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011). Under this framework, Roundtree argues that § 941.29(2) severely burdens the core of the Second Amendment right because it completely restricts the right to bear arms, thus necessitating strict scrutiny review.

¶27 In order to survive strict scrutiny, a statute must be narrowly tailored to advance a compelling state interest. Monroe Cnty. Dep't of Human Servs. v. Kelli B., 2004 WI 48, ¶17, 271 Wis. 2d 51, 678 N.W.2d 831. Strict scrutiny is an exacting standard, and it is the rare case in which a law survives it. State v. Baron, 2009 WI 58, ¶48, 318 Wis. 2d 60, 769 N.W.2d 34.

¶28 The State disagrees and advocates for the application of intermediate scrutiny. In the State's view, such an application would be consistent with the language of Heller and its interpretation by both the court of appeals of this state and the Seventh Circuit. See State v. Pocian, 2012 WI App 58, ¶11, 341 Wis. 2d 380, 814 N.W.2d 894 (citing United States v. Skoien, 614 F.3d 638, 639, 641-42 (7th Cir. 2010) (en banc) ("In a case decided after Heller and McDonald, the Seventh Circuit Court of Appeals utilized an 'intermediate scrutiny' analysis and applied it to a constitutional challenge to a federal law prohibiting an individual convicted of misdemeanor domestic violence from carrying a firearm in or affecting interstate commerce."). Pursuant to an intermediate scrutiny analysis, we

10

ask whether a law is substantially related to an important governmental objective. Id.

¶29 We agree with the State that intermediate scrutiny is the appropriate inquiry to guide our analysis. First, Heller clearly requires more than mere rational basis review of laws that are alleged to burden Second Amendment rights. Heller, 554 U.S. at 628 n.27. "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." Id.

¶30 Second, the intermediate scrutiny approach lends vitality to the Heller court's statement that felon dispossession statutes are "presumptively lawful." Kanter v. Barr, 919 F.3d 437, 448 (7th Cir. 2019). To subject a "presumptively lawful" statute to strict scrutiny would in effect remove the operation of such a presumption. As stated, strict scrutiny is a steep hill to climb.

¶31 Our conclusion is consistent with that of other courts that have considered the question. Indeed, federal courts around the country have interpreted the above-cited language from Heller as indicative of requiring an intermediate scrutiny analysis when examining Second Amendment challenges. See, e.g., Skoien, 614 F.3d at 641-42; Kanter, 919 F.3d at 448; United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010).

¶32 The Wisconsin Court of Appeals has taken the same approach. In both Pocian, 341 Wis. 2d 380, ¶¶11-12, and State v. Culver, 2018 WI App 55, ¶37, 384 Wis. 2d 222, 918 N.W.2d 103,

11

the court of appeals applied intermediate scrutiny to as-applied challenges to the felon-in-possession statute. Support for the use of intermediate scrutiny is thus plentiful in the case law and accepting Roundtree's position would necessitate overruling both Pocian and Culver, which we decline to do.

¶33 In contrast, Roundtree points us to no case in which an appellate court has applied strict scrutiny to a Second Amendment challenge to a felon-in-possession statute.[8] Absent any such application of strict scrutiny in Wisconsin or elsewhere in this type of case, we decline to break new ground.[9]

---

[8] We acknowledge that strict scrutiny has been applied to related federal statutes, but none of those cases finds purchase here. In United States v. Engstrum, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009), the District Court applied strict scrutiny to the federal statute prohibiting firearm possession by a person convicted of a "misdemeanor crime of domestic violence." See 18 U.S.C. § 922(g)(9). Similarly, in Tyler v. Hillsdale Cnty. Sheriff's Dep't, 775 F.3d 308, 328-29 (6th Cir. 2014), reh'g en banc granted, opinion vacated (Apr. 21, 2015), the Sixth Circuit applied strict scrutiny to 18 U.S.C. § 922(g)(4)'s dispossession of a person "who has been committed to a mental institution."

Tyler largely based its application of strict scrutiny on citation to separate writings in other cases, and in any event the opinion has been vacated. Id. at 328-29. Likewise, Engstrum is of little value here because the restriction it addressed was based on a misdemeanor, not a felony.

[9] Justice Rebecca Grassl Bradley's dissent would apply strict scrutiny, citing this court's decision in Mayo v. Wisconsin Injured Patients and Families Compensation Fund, 2018 WI 78, ¶28, 383 Wis. 2d 1, 914 N.W.2d 678. Justice Rebecca Grassl Bradley's dissent, ¶¶73-74. However, Mayo is inapplicable here.

12

¶34 We are likewise unpersuaded by the argument Roundtree makes pursuant to the Seventh Circuit's decision in <u>Ezell</u>, 651

---

In <u>Mayo</u>, an equal protection case regarding the constitutionality of medical malpractice damage caps, the majority of the court overruled the "rational basis with teeth" standard from <u>Ferdon ex rel. Petrucelli v. Wisconsin Patients Compensation Fund</u>, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440. <u>Mayo</u>, 383 Wis. 2d 1, ¶32. The "rational basis with teeth" standard from <u>Ferdon</u>, although similar, is different from intermediate scrutiny.

The <u>Ferdon</u> court set forth that "rational basis with teeth" "focuses on the legislative means used to achieve the ends. This standard simply requires the court to conduct an inquiry to determine whether the legislation has more than a speculative tendency as the means for furthering a valid legislative purpose." <u>Ferdon</u>, 284 Wis. 2d 573, ¶78. Intermediate scrutiny, on the other hand, asks whether a law is "substantially related to an important governmental objective." <u>State v. Pocian</u>, 2012 WI App 58, ¶11, 341 Wis. 2d 380, 814 N.W.2d 894 (citation omitted).

Importantly, the <u>Ferdon</u> court explicitly disclaimed that it was applying intermediate scrutiny. It stated that rational basis was the "appropriate level of scrutiny in the present case," clearly evidencing a distinction between intermediate scrutiny and "rational basis with teeth." See <u>Ferdon</u>, 284 Wis. 2d 573, ¶¶63-65.

Further, the <u>Mayo</u> court specifically stated that it was addressing levels of scrutiny for equal protection challenges. <u>Mayo</u>, 383 Wis. 2d 1, ¶28. Roundtree's challenge is not based on the equal protection clause, but on a purported abridgement of his Second Amendment rights.

The intermediate scrutiny standard thus is well established and retains vitality. In 1996, a unanimous court first adopted and applied the intermediate scrutiny analysis in a challenge to a cruising ordinance as violative of the constitutional right to travel. See <u>Brandmiller v. Arreola</u>, 199 Wis. 2d 528, 540-41, 544 N.W.2d 894 (1996). More recently, in <u>State v. Culver</u>, 2018 WI App 55, ¶37, 384 Wis. 2d 222, 918 N.W.2d 103, the court of appeals, post-<u>Mayo</u>, addressed the same question at issue here and applied intermediate scrutiny.

13

F.3d 684. He bases this argument on the Ezell court's statement that "the rigor of . . . judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Id. at 703. In Roundtree's view, the felon-in-possession statute implicates the core Second Amendment right and severely burdens such a right, necessitating the most rigorous level of scrutiny.

¶35 However, this argument rests on a faulty premise. As the Seventh Circuit explained in Kanter, less than strict scrutiny review is appropriate here because "the weight of the historical evidence . . . suggests that felon dispossession laws do not restrict the 'core right of armed defense,' but rather burden 'activity lying closer to the margins of the right.'" Kanter, 919 F.3d at 448 n.10. Instead, the core right identified in Heller is "the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense . . . ." United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis removed).

¶36 Like the Seventh Circuit in Kanter, we need not conclusively determine the scope of the historical protections of the Second Amendment. Kanter, 919 F.3d at 447; see infra, ¶41. But also like the Seventh Circuit in Kanter, we are not persuaded that the core Second Amendment right is implicated so as to require strict scrutiny review.

14

¶37 Accordingly, we determine that Roundtree's challenge to Wis. Stat. § 941.29(2) requires the application of an intermediate level of scrutiny.[10]

B

¶38 We next apply intermediate scrutiny to the felon-in-possession statute considering the facts of this case.

¶39 Generally, Second Amendment challenges require this court to undertake a two-step approach. State v. Herrmann, 2015 WI App 97, ¶9, 366 Wis. 2d 312, 873 N.W.2d 257. We ask first "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Id. (quoting Marzzarella, 614 F.3d at 89). If the answer is no, then the inquiry ends. Id.

¶40 If the first inquiry is answered in the affirmative, then the court proceeds to inquire into "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." Id. (quoting Ezell, 651 F.3d at 703).

---

[10] We observe that defendants around the country who raise as-applied challenges to felon-in-possession statutes will face an uphill climb. See Pocian, 341 Wis. 2d 380, ¶12 (explaining that as of the writing of that opinion, "[n]o state law banning felons from possessing guns has ever been struck down").

Of those federal circuits that have not foreclosed such challenges entirely, only one has ever upheld an as-applied Second Amendment challenge to the federal statute banning firearm possession by certain individuals convicted of crimes. See Binderup v. Att'y Gen. U.S., 836 F.3d 336 (3d Cir. 2016); 18 U.S.C. § 922(g); see also Kanter v. Barr, 919 F.3d 437, 442-44 (7th Cir. 2019).

15

¶41 The Seventh Circuit has described the historical evidence as to whether felons were categorically excluded from the Second Amendment's scope as "inconclusive." Kanter, 919 F.3d at 445. Accordingly, when faced with an as-applied challenge to the federal felon-in-possession statute, the court declined to resolve the first step of the inquiry and instead relied on the dispositive second step——the application of a means-end scrutiny analysis. Id. at 447. We take a similar approach here.

¶42 Like the court in Kanter, we assume that the felon-in-possession statute burdens conduct falling within the scope of the Second Amendment's guarantee in order to reach the dispositive issue. Our inquiry, then, focuses on whether the statute at issue is substantially related to an important governmental objective.

¶43 As other courts in this state and elsewhere have done, we recognize public safety generally, and preventing gun violence specifically, as important governmental objectives. See Pocian, 341 Wis. 2d 380, ¶15; Kanter, 919 F.3d at 448. Indeed, "[p]ublic safety and the protection of human life is a state interest of the highest order." State v. Miller, 196 Wis. 2d 238, 249, 538 N.W.2d 573 (Ct. App. 1995).

¶44 Roundtree protests that he should not be prohibited from firearm possession because his felony conviction did not involve violence. He claims that the nature of his conviction and the fact that it is remote in time weigh in favor of a

16

determination that Wis. Stat. § 941.29(2) is unconstitutional as applied to him.

¶45 We are not persuaded that the specific facts of Roundtree's case compel such a conclusion. Roundtree was convicted of failure to support a child for over 120 days. In his view, this is different in kind from the crime at issue in Pocian, where the defendant was convicted of uttering a forgery as the underlying felony. Put frankly, he suggests that failing to pay child support is not as bad as "physically taking a victim's property."

¶46 But failure to pay child support is every bit as serious as uttering a forgery if not more so. Those who fail to make support payments deprive the very people they should be protecting most, their own children, from receiving basic necessities. Roundtree chose to keep money for himself that rightly belonged to his children. And, to further add to the egregiousness of his offense, he committed this crime repeatedly by failing to support for at least 120 days. By all accounts this is a serious offense.

¶47 Simply because his crime was not physically violent in nature, it does not follow that the felon-in-possession statute cannot be constitutionally applied to Roundtree. The Seventh Circuit determined as much in Kanter when it concluded that "the government has shown that prohibiting even nonviolent felons like Kanter from possessing firearms is substantially related to its interest in preventing gun violence." Kanter, 919 F.3d at

17

448.  The legislature did not in Wis. Stat. § 941.29(2) create a hierarchy of felonies, and neither will this court.

¶48 Even in the case of those convicted of nonviolent felonies, "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use."  United States v. Yancey, 621 F.3d 681, 685 (7th Cir. 2010).  Thus, even if a felon has not exhibited signs of physical violence, it is reasonable for the State to want to keep firearms out of the hands of those who have shown a willingness to not only break the law, but to commit a crime serious enough that the legislature has denominated it a felony, as Roundtree has here.

¶49 The State has cited an abundance of research to support this conclusion.  "Other courts addressing this issue have observed that nonviolent offenders not only have a higher recidivism rate than the general population, but certain groups——such as property offenders——have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent."  Kaemmerling v. Lappin, 553 F.3d 669, 683 (D.C. Cir. 2008) (citing Ewing v. California, 538 U.S. 11, 26 (2003)).

¶50 As the Kanter court noted, several studies "have found a connection between nonviolent offenders . . . and a risk of future violent crime."  Kanter, 919 F.3d at 449.

> For example, one study of 210,886 nonviolent offenders found that about one in five were rearrested for a violent crime within three years of his or her release.  See U.S. Dep't of Justice, Bureau of Justice

18

> Statistics Profile of Nonviolent Offenders Exiting State Prisons 2, 4 (2004). A separate study found that 28.5 percent of nonviolent property offenders——a category that includes fraud convictions——were rearrested for a violent offense within five years of their release. See Matthew R. Durose, et al., U.S. Dep't of Justice, Bureau of Justice Statistics, Recidivism of Prisoner Released in 30 States in 2005: Patterns from 2005 to 2010, at 9 (2014). Yet another study found that "even handgun purchasers with only 1 prior misdemeanor conviction and no convictions for offenses involving firearms or violence were nearly 5 times as likely as those with no prior criminal history to be charged with new offenses involving firearms or violence." Garen J. Wintemute, et al., Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns, 280 J. Am. Med. Ass'n 2083, 2083 (1998) (emphasis added).

Id.

¶51 Such assertions are echoed by data from the Wisconsin Department of Corrections (DOC). For example, DOC data indicate that among recidivists who committed public order offenses, such as failure to pay child support, and were released from prison in 2011, 21.4 percent recidivated with a violent offense. Joseph R. Tatar II & Megan Jones, Recidivism after Release from Prison, Wis. Dep't of Corrections, at 14 (August 2016), https://doc.wi.gov/DataResearch/InteractiveDashboards/Recidivism AfterReleaseFromPrison_2.pdf. As the State strikingly observes in its brief, "the 21.4 percent rate of public order offenders recidivating with a violent crime was higher than that of property offenders (16 percent) and drug offenders (17.9 percent). And it was just seven percentage points lower than the rate of violent offenders (28.3 percent)." This data is surely sufficient to support a substantial relation between

19

keeping firearms out of the hands of those convicted of nonviolent felonies and the public safety objective of preventing gun violence.

¶52 Further, the fact that Roundtree's conviction occurred over ten years ago does not affect the result. Roundtree asserts that he poses no danger to public safety and should be able to possess a firearm as a result. However, the record indicates that the gun Roundtree possessed was stolen and purchased off the street. Supporting street level gun commerce is hardly the benign action Roundtree would have us believe it is.

¶53 In sum, we determine that Roundtree's challenge to the felon-in-possession statute (Wis. Stat. § 941.29(2)) requires the application of an intermediate level of scrutiny. Under such an intermediate scrutiny analysis, we conclude that the felon-in-possession statute is constitutional as applied to Roundtree because the statute in question is substantially related to important governmental objectives, namely public safety and the prevention of gun violence.

¶54 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶55 REBECCA FRANK DALLET, J. (*concurring*). I write separately to address the unanswered question of whether by pleading guilty Roundtree waived his as-applied challenge to the constitutionality of Wis. Stat. § 941.29(2). I conclude that, following Class v. United States, 583 U.S. ___, 138 S. Ct. 798 (2018), he did not.

¶56 Generally, a defendant who pleads guilty with the assistance of reasonably competent counsel waives his right to later raise an independent claim related to a deprivation of his constitutional rights that occurred prior to his pleading guilty. See Tollett v. Henderson, 411 U.S. 258, 267 (1973). The rationale behind this "guilty-plea-waiver rule" is that a counseled guilty plea admits "all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." United States v. Broce, 488 U.S. 563, 569 (1989).[1]

¶57 In order to balance efficient judicial administration with the rights protected by the United States Constitution, the United States Supreme Court has developed exceptions to the guilty-plea-waiver rule for claims that implicate the State's very power to prosecute the defendant, provided that a court can resolve those claims without venturing beyond the record. See id. at 574-76; Menna v. New York, 423 U.S. 61, 63 n.2 (1975)

---

[1] We have interpreted this rule, like other waiver rules, to be one of judicial administration that does not deprive an appellate court of jurisdiction. See State v. Riekoff, 112 Wis. 2d 119, 123-24, 332 N.W.2d 744 (1983).

1

(per curiam) (guilty plea did not waive a constitutional challenge under the Double Jeopardy Clause when the claim could be resolved on the existing record); see also Blackledge v. Perry, 417 U.S. 21, 30-31 (1974) (guilty plea did not foreclose a defendant's habeas petition alleging "unconstitutional vindictive prosecution" because the Due Process Clause precluded the State from even prosecuting the defendant).

¶58 Although the guilty-plea-waiver rule arose in the federal context, this court has steadfastly adopted that precedent. See, e.g., State v. Kelty, 2006 WI 101, ¶42, 294 Wis. 2d 62, 716 N.W.2d 886; Hawkins v. State, 26 Wis. 2d 443, 448, 132 N.W.2d 545 (1965). Wisconsin courts have broadened the federal exceptions, recognizing that a guilty plea does not waive facial challenges to the constitutionality of the statute of conviction. See, e.g., State v. Molitor, 210 Wis. 2d 415, 419 n.2, 565 N.W.2d 248 (Ct. App. 1997). This court, however, has not yet extended that exception to as-applied constitutional challenges. See State v. Cole, 2003 WI 112, ¶46, 264 Wis. 2d 520, 665 N.W.2d 328; State v. Trochinski, 2002 WI 56, ¶34 n.15, 253 Wis. 2d 38, 644 N.W.2d 891. But following Class, the application of the guilty-plea-waiver rule should no longer depend upon whether an appeal challenging the constitutionality of a statute is classified as facial or as-applied.

¶59 In Class, the United States Supreme Court applied an exception to the guilty-plea-waiver rule to allow a defendant to challenge the constitutionality of the statute of conviction on

2

appeal. 138 S. Ct. at 803-05. Class pleaded guilty to unlawfully carrying a firearm on U.S. Capitol grounds, contrary to 40 U.S.C. § 5104(e)(1), after the police had found three guns in his car in a Capitol parking lot. On appeal, Class argued that the statute violated his due-process rights since he did not have fair notice that a parking lot was part of the Capitol "grounds." Id. at 802. Class also claimed that the statute violated his Second Amendment rights because "Capitol Grounds" included so broad an area that it was practically impossible to lawfully carry a firearm anywhere within the District of Columbia. Id. In allowing both claims to proceed, the Court rested its decision on its 150-year-old understanding of the nature of a guilty plea:

> The plea of guilty is, of course, a confession of all the facts charged in the indictment, and also of the evil intent imputed to the defendant. It is a waiver also of all merely technical and formal objections of which the defendant could have availed himself by any other plea or motion. But if the facts alleged and admitted do not constitute a crime against the laws of the Commonwealth, the defendant is entitled to be discharged.

Id. at 804 (quoting Commonwealth v. Hinds, 101 Mass. 209, 210 (1869)). The Court held that Class's guilty plea did not waive his claims challenging the constitutionality of the statute of conviction because those claims involved the State's ability to constitutionally prosecute Class and did not contradict the terms of the indictment or the written plea agreement. Id. at 805.

¶60 Given the Court's analysis in Class, there is no justification for continuing to treat as-applied challenges to

3

the constitutionality of the statute of conviction any differently than facial challenges. After all, Class did not hinge on the type of constitutional challenge being raised. See United States v. Alarcon Sanchez, 972 F.3d 156, 166 n.3 (2d Cir. 2020) ("Pursuant to the holding in Class, defendants have a right to raise on appeal both as-applied and facial constitutional challenges to the [statute of conviction]."). Indeed, when addressing the merits of Class's challenges on remand, the D.C. Circuit Court of Appeals treated both of his claims as as-applied challenges. See United States v. Class, 930 F.3d 460 (D.C. Cir. 2019). But see State v. Jackson, 2020 WI App 4, ¶¶8-9, 390 Wis. 2d 402, 938 N.W.2d 639 (noting that it was "not clear . . . whether Class'[s] challenge was an as-applied or facial challenge"). Second, and more importantly, the Court's reasoning in Class must apply equally to facial and as-applied challenges because both types of challenges "call into question the Government's power to 'constitutionally prosecute'" the defendant. Class, 138 S. Ct. at 805 (quoting Broce, 488 U.S. at 575) (adding that whether a constitutional challenge can be classified as "jurisdictional" is also not dispositive).

¶61 This court should therefore adopt the holding in Class, not only to remain consistent with United States Supreme Court precedent but also to continue to strike the proper balance between efficient judicial administration and the protection of a defendant's constitutional rights. See Kelty, 294 Wis. 2d 62, ¶27. It should be the law in Wisconsin

4

that a guilty plea does not waive a defendant's right to challenge the statute of conviction's constitutionality, facially or as applied, provided the challenge can be resolved without contradicting the record. We should withdraw language from Cole and Trochinski and clarify the court of appeals' holding in Jackson to the extent that those decisions hold that a defendant who pleads guilty waives his right to later raise an as-applied constitutional challenge to the statute of conviction.[2]

¶62 For the foregoing reasons, I respectfully concur.

¶63 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY joins this concurrence.

---

[2] See State v. Cole, 2003 WI 112, ¶46, 264 Wis. 2d 520, 665 N.W.2d 328; State v. Trochinski, 2002 WI 56, ¶34 n.15, 253 Wis. 2d 38, 644 N.W.2d 891; State v. Jackson, 2020 WI App 4, ¶¶8-9, 390 Wis. 2d 402, 938 N.W.2d 639.

5

¶64 REBECCA GRASSL BRADLEY, J. *(dissenting).* The Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. St. George Tucker, a pre-eminent constitutional law scholar during the founding era, described the Second Amendment as "the true palladium of liberty . . . . The right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." St. George Tucker, <u>Blackstone's Commentaries</u> 1: App. 300 (1803). In plainer words, the Second Amendment is the people's ultimate protection against tyranny.

¶65 Applying the original public meaning of this bulwark of liberty, the United States Supreme Court more than a decade ago finally dispelled the prevalent, but historically ignorant notion that the Second Amendment protects merely a collective, militia member's right. The Supreme Court declared the right to keep and bear arms is "exercised <u>individually</u> and belongs to <u>all Americans</u>"; accordingly, "the District [of Columbia]'s ban on handgun possession in the home violates the Second Amendment . . . ." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 581, 635 (2008) (emphasis added). <u>See also</u> Letter from Thomas Jefferson to James Madison (Dec. 20, 1787), <u>in</u> <u>The Papers</u>

1

of Thomas Jefferson, XII, 438-40 (Julian Boyd ed., 1950) ("Let me add that a bill of rights is what the people are entitled to against every government on earth, general or particular, [and] what no just government should refuse or rest on inference.") (emphasis added). Any encroachment upon this fundamental right must withstand strict judicial scrutiny. Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, ¶9, 373 Wis. 2d 543, 892 N.W.2d 233 (declaring the right to keep and bear arms to be "a species of right we denominate as 'fundamental'"); Mayo v. Wisconsin Injured Patients & Families Comp. Fund, 2018 WI 78, ¶28, 383 Wis. 2d 1, 914 N.W.2d 678 ("Strict scrutiny is applied to statutes that restrict a fundamental right.").

¶66 Ignoring conclusive historical evidence to the contrary, the majority upholds the constitutionality of Wisconsin's categorical ban on the possession of firearms by any person convicted of a felony offense,[1] regardless of whether that individual is dangerous. Under the majority's vision of what is good for society, "even if a felon has not exhibited signs of physical violence, it is reasonable for the State to want to keep firearms out of the hands of those who have shown a willingness to . . . break the law." Majority op., ¶48 (emphasis added). It may be "reasonable" to the majority but it surely isn't constitutional. "The very enumeration of the right takes out of the hands of government——even the Third Branch of Government——the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional

---

[1] See Wis. Stat. § 941.29(1m).

guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." Heller, 554 U.S. at 634 (emphasis in original). Centuries of history warned the Founders that governments certainly wanted to keep arms out of the hands of the citizenry in order to ease the establishment of tyranny——and they often succeeded. It is for this very reason that the Framers insisted on preserving the individual right to keep and bear arms for all Americans.

¶67 Under Wis. Stat. § 941.29(1m), the State deprives Leevan Roundtree of his fundamental constitutional right to keep and bear arms, based solely on his failure to pay child support more than ten years ago, with no showing that he poses a danger to society. Applying the wrong standard of review, the majority sidelines the United States Constitution, demotes the Second Amendment to second-class status,[2] and endorses a blanket ban on one of our most fundamental constitutional liberties. In doing so, the majority contravenes the original public meaning of the Second Amendment. I dissent.

I

¶68 The Constitution takes precedence over any statute, and any statute in conflict with the Constitution cannot stand. "The [C]onstitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with

---

[2] See McDonald v. City of Chicago, 561 U.S. 742, 780 (2010) ("[R]espondents, in effect, ask us to treat the right recognized in Heller as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause.").

3

ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the [C]onstitution is not law; if the latter part be true, then written [C]onstitutions are absurd attempts on the part of the people to limit a power in its own nature illimitable." Marbury v. Madison, 5 U.S. 137, 177 (1803). Bearing in mind that the Second Amendment protects the "first law of nature"——the right to defend oneself——any infringement of the right must be concordant with the Constitution and may replicate only those restrictions society accepted at the founding. Permitting restraints on the right to keep and bear arms that were never contemplated by the Framers lends an illimitable quality to the legislative power to regulate a fundamental right, thereby deflating the primacy of the Constitution and imperiling the liberty of the people.

¶69 Wisconsin Stat. § 941.29(1m) bans all felons from possessing a firearm in this state: "[a] person who possesses a firearm is guilty of a Class G felony if any of the following applies: (a) [t]he person has been convicted of a felony in this state, [or] (b) [t]he person has been convicted of a crime elsewhere that would be a felony if committed in this state." This felon dispossession statute draws no distinction between an individual convicted of first-degree homicide and someone convicted of "failing to comply with any record-keeping requirement for fish" (a felony in this state). Wis. Stat. § 29.971(1)(c). Rather than the historically recognized

4

revocation of Second Amendment rights predicated on an individual's dangerousness to society, the Wisconsin Legislature instead rescinds those rights based merely on a felony conviction, irrationally preserving the right to keep and bear arms for both violent and dangerous citizens.

¶70 In 2003, Roundtree failed to pay child support for more than 120 consecutive days, resulting in his conviction for a felony under Wis. Stat. § 948.22(2). Roundtree was sentenced to four years of probation and later paid his past due child support. Nearly 13 years later, while executing a search warrant on Roundtree's property, the police found a handgun tucked beneath his mattress. The State charged Roundtree with violating Wis. Stat. § 941.29(1m).[3] The majority concludes that Roundtree's felony conviction for failure to timely pay child support more than a decade earlier permanently forecloses his individual Second Amendment rights. Although the United States Supreme Court has never opined on the constitutionality of felon dispossession laws, the majority reflexively follows federal jurisdictions in upholding these laws, neglecting (as other courts have) to conduct the historical analysis necessary to ascertain the original public meaning of the Second Amendment in this regard.

¶71 Troublingly, the majority applies intermediate scrutiny to a statute that demands strict scrutiny review, while

---

[3] Roundtree was actually convicted under Wis. Stat. § 941.29(2), but sub. (2) was subsequently repealed and replaced with Wis. Stat. § 941.29(1m). For consistency and to avoid confusion, I use sub. (1m) throughout.

declining to discern whether the people who ratified the Bill of Rights consented to the removal of the Second Amendment right from non-violent felons. While legislatures have always had the power to prohibit people who are dangerous from possessing firearms, the Second Amendment does not countenance collectively depriving <u>all</u> felons of their <u>individual</u> Second Amendment rights. Such laws sweep too broadly, disarming those who pose no danger to society. And if the professed purpose of felon dispossession laws is "public safety and the prevention of gun violence" as the majority describes,[4] then Wisconsin's lawmakers need to adjust their aim; Wis. Stat. § 941.29(1m) leaves violent misdemeanants free to keep and bear arms.

¶72 Since the founding of our nation, Americans have understood their right to keep and bear arms as fundamental to the people's self-preservation and defense. <u>Heller</u>, 554 U.S. at 593-94 ("By the time of the founding, the right to have arms had become fundamental for English subjects," citing Blackstone's description of "the right of having and using arms for self-preservation and defence"). In <u>Wisconsin Carry</u>, this court expressly recognized the right to keep and bear arms to be "a species of right we denominate as 'fundamental,' reflecting our understanding that it finds its protection, but not its source, in our constitutions." 373 Wis. 2d 543, ¶9 (citations omitted). During the ratifying conventions, "there was broad consensus between Federalists and their opponents on the existence and nature of the 'natural right' to keep and bear arms for

---

[4] Majority op., ¶4.

6

defensive purposes." Binderup v. Atty. Gen. U.S. of America, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring). Although we expound only the Second Amendment in this case, this court has also deemed the people's right to keep and bear arms protected under the Wisconsin Constitution[5] to be a fundamental right. State v. Cole, 2003 WI 112, ¶20, 264 Wis. 2d 520, 665 N.W.2d 328 ("We find that the state constitutional right to bear arms is fundamental."). Because Wis. Stat. § 941.29(1m) restricts a fundamental right that predates and is "independent of" the Constitution entirely, Wisconsin Carry, 373 Wis. 2d 543, ¶9, strict scrutiny must apply.

¶73 Inexplicably, but quite conveniently, the majority opinion never mentions Wisconsin Carry, nor does it even utter the word "fundamental." When a challenged statute impairs a fundamental right, this court must apply a heightened level of scrutiny. Very recently, this court articulated that "[s]trict scrutiny is applied to statutes that restrict a fundamental right." Mayo, 383 Wis. 2d 1, ¶28. Not only does the majority disregard the nature of the right to keep and bear arms, it also fails to apply Mayo, which hardly imposed a novel approach to examining laws restricting fundamental rights. Strict scrutiny has never been limited to equal protection challenges. We recently reiterated that "[a] statute which directly and substantially infringes upon a fundamental liberty interest must withstand strict scrutiny: it must be narrowly tailored to

---

[5] See Article 1, Section 25 of the Wisconsin Constitution: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose."

7

serve a compelling state interest." Matter of Visitation of A.A.L., 2019 WI 57, ¶18, 387 Wis. 2d 1, 927 N.W.2d 486. See also Burson v. Freeman, 504 U.S. 191, 199 (1992); Reno v. Flores, 507 U.S. 292, 301-02 (1993). Strict scrutiny applies "when a statute impinges on a 'fundamental right' or creates a classification that 'operates to the peculiar disadvantage of a suspect class.'" Metropolitan Associates v. City of Milwaukee, 2011 WI 20, ¶60 n.20, 332 Wis. 2d 857, 96 N.W.2d 717 (emphasis added). In Larson v. Burmaster, 2006 WI App 142, ¶42, 295 Wis. 2d 333, 720 N.W.2d 134, the Wisconsin Court of Appeals held that "strict scrutiny is applied" when a "fundamental constitutional right is violated."

¶74 Without explanation, the majority altogether ignores its holding in Wisconsin Carry and refuses to apply Mayo, two cases we recently decided. The majority threatens every Wisconsin citizen's right to keep and bear arms by failing to acknowledge the right as fundamental and accordingly using the wrong level of review. In electing to apply an intermediate level of scrutiny, the majority misconstrues the nature of the infringement of Roundtree's Second Amendment right. Its error stems from mischaracterizing the person who seeks to exercise his Second Amendment right as an "activity lying closer to the margins of the right." Majority op., ¶35 (emphasis added) (citing Kanter v. Barr, 919 F.3d 437, 448 n.10 (7th Cir. 2019)). Of course, a person is not an "activity" and in this case, Roundtree wishes to exercise what Heller pronounced to be the "core lawful purpose of armed defense," which the State of

8

Wisconsin totally denies him. 554 U.S. at 630. "[A] lifetime ban on any felon possessing any firearm" undoubtedly "does impair the 'core conduct' of self-defense in the home—at least for a felon who has completed his sentence, or someone who shares his household." C. Kevin Marshall, Why Can't Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 697 (2009). Such "broadly prohibitory laws restricting the core Second Amendment right . . . are categorically unconstitutional." Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011). Roundtree's core right to possess a firearm in his own home is not merely restricted, it is extinguished. This alone warrants strict scrutiny.

¶75 Ultimately, the level of scrutiny applied is not dispositive; Wis. Stat. § 941.29(1m) fails under either level of review. More importantly, the statute is inconsistent with the historical understanding of the scope of the Second Amendment right and who possesses it. For this reason, Heller declined to adopt a particular level of scrutiny.[6] The Supreme Court expressed only that "'rational basis' . . . could not be used to evaluate the extent to which a legislature may regulate a

---

[6] District of Columbia v. Heller, 554 U.S. 570, 581, 628 (2008). See also State v. Sieyes, 225 P.3d 995, ¶34 (Wash. 2010) ("We follow Heller in declining to analyze [Washington's statute restricting the rights of children to keep and bear arms] under any level of scrutiny. Instead we look to the Second Amendment's original meaning, the traditional understanding of the right, and the burden imposed on children by upholding the statute. See generally Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1449 (2009).").

9

specific, enumerated right" such as "the right to keep and bear arms." Heller, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would . . . have no effect."). If anything, Heller signals that courts should approach challenges to statutes infringing the Second Amendment right with a rigorous review of history, rather than the inherently subjective consideration of whether the government's interest in curtailing the right outweighs the individual's interest in exercising it. "As to the ban on handguns[,] . . . the Supreme Court in Heller never asked whether the law was narrowly tailored to serve a compelling government interest (strict scrutiny) or substantially related to an important government interest (intermediate scrutiny). If the Supreme Court had meant to adopt one of those tests, it could have said so in Heller and measured D.C.'s handgun ban against the relevant standard. But the Court did not do so; it instead determined that handguns had not traditionally been banned and were in common use—and thus that D.C.'s handgun ban was unconstitutional." Heller v. District of Columbia, 670 F.3d 1244, 1273 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). The majority in this case should have conducted the historical analysis necessary to determine whether felons were traditionally dispossessed of their weapons. They weren't, unless they were dangerous to society. Accordingly, Wisconsin's categorical dispossession of all felons irrespective of whether they pose a danger to the public is unconstitutional.

¶76 Although the United States Supreme Court has declined to pronounce the appropriate level of review for statutes burdening the fundamental right to keep and bear arms in favor of discerning the traditional understanding of the Second Amendment, this court (as it must) has recognized the right to keep and bear arms to be fundamental, and this court has declared strict scrutiny to be the appropriate level of scrutiny "applied to statutes that restrict a fundamental right." Mayo, 383 Wis. 2d 1, ¶28. At the very least, the majority should explain why it now subordinates the fundamental, constitutional right to keep and bear arms.

II

¶77 Statutes subject to strict scrutiny rarely survive. Burson v. Freeman, 504 U.S. 191, 211 (1992) ("[I]t is the rare case in which we have held that a law survives strict scrutiny."). In order to survive, "a statute must serve a compelling state interest[,] . . . be necessary to serving that interest[,] and . . . be narrowly tailored toward furthering that compelling state interest." Mayo, 383 Wis. 2d 1, ¶28. Historically, laws that dispossessed the violent served the compelling state interest in public safety. Wisconsin's felon dispossession law, however, ensnares the non-violent, thereby detaching itself from the statute's ostensible purpose.

¶78 Even assuming Wisconsin's felon dispossession statute serves the unquestionably compelling state interest in public

11

safety,[7] the statute is not "narrowly tailored" toward advancing that interest because it applies to any individual convicted of a felony offense, even if that person poses no danger to society. For example: "One man beats his wife, harming her physically and emotionally and traumatizing their children who witness the assault. He may, however, only have committed battery, a misdemeanor." State v. Thomas, 2004 WI App 115, ¶47, 274 Wis. 2d 513, 683 N.W.2d 497 (Schudson, J., concurring) (emphasis in original). The legislature allows this undisputedly violent man to possess a firearm. "Another man enters a garage to steal a shovel; he has committed a burglary," which is a felony offense. Id. The legislature forever prohibits him from possessing a firearm. "One woman drives while intoxicated, threatening the lives of countless citizens. Under Wisconsin's drunk driving laws——the weakest in the nation——she has committed a non-criminal offense if it is her first, or only a misdemeanor unless it is her fifth (or subsequent) offense." Id., ¶48. Wisconsin's legislature deems this woman fit to possess a firearm. "Another woman, however, forges a check; she has committed a felony." Id. As a result, Wisconsin's legislature forever prohibits her from possessing a firearm. Despite the utterly ineffectual distinctions drawn by the legislature, the majority allows the legislature to permanently dispossess non-dangerous individuals of their Second Amendment rights while allowing violent citizens to retain them.

---

[7] State v. Pocian, 2012 WI App 58, ¶12, 341 Wis. 2d 380, 814 N.W.2d 894 (quoted source omitted) (holding that felon dispossession statutes are a "matter of public safety").

12

Even intermediate scrutiny cannot save a statute that purports to serve an important government interest——protecting society from violent criminals——but fails so miserably to achieve it.

¶79 In considering an as-applied challenge to a law "that entirely bars the challenger from exercising the core Second Amendment right, any resort to means-end scrutiny is inappropriate" when the challenger falls outside of "the historical justifications supporting the regulation." Binderup, 836 F.3d at 363 (Hardiman, J., concurring). Instead, "such laws are categorically invalid as applied to persons entitled to Second Amendment protection." Id. In Binderup, a federal statute dispossessing all individuals convicted of state misdemeanors punishable by more than two years in prison went "even further than the 'severe restriction' struck down in Heller: it completely eviscerate[d] the Second Amendment right" as to an entire group of individuals who were historically proven to retain it. Id. at 364. So too with Wisconsin's categorical ban on the possession of firearms by non-dangerous felons. The original meaning of the Second Amendment, encompassing a traditional understanding of the scope of the rights it protects as well as the range of historically recognized restrictions, establishes this statute's unconstitutionality, independent of the application of any standard of scrutiny.

III

¶80 At its inception, the right to keep and bear arms protected under the Second Amendment was never understood to

13

countenance the categorical exclusion of felons that Wis. Stat. § 941.29(1m) endorses. Historically, legislatures prohibited only dangerous people from possessing a firearm, not an individual like Roundtree who, although convicted of a felony offense, poses no demonstrable risk to the public. This more narrowly drawn restriction reflects the nature of the right as an individual, rather than a merely collective or civil one.

¶81 In drafting the Second Amendment, "both Federalists and Anti-Federalists accepted an individual right to arms; the only debate was over how best to guarantee it." Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 223 (1983). The Founders settled on the following language: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. When judges interpret constitutional text, we give words their original public meaning. Judges who instead inject a modern gloss over constitutional provisions impermissibly change their meaning, a right reserved to the people through the process of constitutional amendment. In interpreting the Second Amendment, we accordingly apply the particular meaning of the words "militia" and "right of the people" as they were understood at the time of ratification.

¶82 At the time of the founding, "militia" meant "the body of the people"——an adult citizenry "who were not simply allowed to keep their own arms, but affirmatively required to do so." Letters from the Federal Farmer to the Republican 123 (W.

14

Bennett ed. 1978) (ascribed to Richard Henry Lee) ("A militia, when properly formed, are in fact the people themselves . . . ."); Kates, supra, at 214 (discussing how, in the pre-colonial tradition, male citizens were required to keep arms for purposes of law enforcement).  It was the citizenry's collection of personally-owned firearms that made possible law enforcement and military service during the founding era.  After all, the Founders preserved this right primarily in response to the tyranny witnessed in England and its corresponding colonies. As George Mason warned, it was the goal of the English monarch "to disarm the people," as that was the "best and most effectual way to enslave them."  3 J. Elliot, Debates in the Several State Conventions 380 (2d ed. 1836).

¶83 As a principal means of resisting such tyranny, the Founders enshrined the "right of the people" to keep and bear arms as an individual right.  As Richard Henry Lee understood, "to preserve liberty, it is essential that the whole body of the people always possess arms and be taught alike, especially when young, how to use them."  Kates, supra, at 221-22 (citing Letters from the Federal Farmer, supra, at 124).  For Lee, the right to keep and bear arms formed a bedrock of an independent nation and free society.  The Second Amendment "right of the people" perfectly mirrors the language found in the First and Fourth Amendments.  In each of these provisions, "the people" unequivocally retain far-reaching and fundamental individual rights under the Constitution.  As Heller acknowledged, "the people" "refers to a class of persons who are part of a national

15

community or who have otherwise developed sufficient connection with this country to be considered part of that community." Heller, 554 U.S. at 580 (citing United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990)).  It is within the context of this broad protection of individual liberty that the Second Amendment must be understood.  While the Constitution permits certain restrictions, regulations, and forfeitures of the right to keep and bear arms, any curtailing of such a fundamental liberty interest requires close judicial inspection.

¶84 In a case also concerning a constitutional challenge to Wis. Stat. § 941.29(1m), Seventh Circuit Court of Appeals Judge Amy Barrett undertook the "exhaustive historical analysis" of the Second Amendment as applied to felons, an issue left unexamined in Heller, which did not consider the constitutionality of felon dispossession laws.  In that seminal opinion, then-Judge Barrett concluded that "[h]istory is consistent with common sense:  it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns[,] [b]ut that power extends only to people who are dangerous."  Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).  Founding-era state ratifying conventions and contemporaneously-enacted legislation reveal that the Second Amendment never empowered legislatures to disarm non-dangerous felons.

¶85 Language protecting the right to bear arms proposed during the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions is frequently cited as evidence of the

16

constitutionality of felon disarmament. Kanter, 919 F.3d at 455 (Barrett, J., dissenting). All three proposals, however, would have excluded from the Second Amendment's protections only people who were dangerous. Id. at 456. The New Hampshire state convention proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 761 (1971) (emphasis added). At the time, "[t]his limitation targeted a narrow group because 'rebellion' was a very specific crime" denoting treason. Kanter, 919 F.3d at 455 (Barrett, J., dissenting) (citing Rebellion, 2 New Universal Etymological English Dictionary (4th ed. 1756)). Nothing in the historical record suggests New Hampshire would have extended disarmament to common criminals, much less individuals who posed no risk to public safety.

¶86 The same can be said for the proposal from the Massachusetts convention. Samuel Adams suggested limiting the right to bear arms to "peaceable citizens." Id. (citing Schwartz, supra, at 681). In the founding era, "'peaceable' meant '[f]ree from war; free from tumult'; '[q]uiet; undisturbed'; '[n]ot violent; not bloody'; '[n]ot quarrelsome; not turbulent.'" Kanter, 919 F.3d at 455 (Barrett, J., dissenting) (citing 1 Samuel Johnson, A Dictionary of the English Language (5th ed. 1773)). Each of the antonyms of "peaceable" connote some form of danger to the public at large. In other words, the Massachusetts convention couched its proposed Second Amendment limitation within the context of one's

17

propensity for violence; nothing in the language purports to exclude criminals as a class.

¶87 Lastly, although the Pennsylvania convention offered ostensibly the strongest restriction on Second Amendment rights, a more careful reading of this proposal suggests otherwise. The Pennsylvania Minority proposed: "That the people have a right to bear arms . . . and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." Schwartz, supra, at 665 (emphasis added). There are two potential interpretations of this language: one that would exclude both criminals as well as the otherwise dangerous, and another that would exclude those who pose a danger to society, irrespective of whether they have committed crimes. Kanter, 919 F.3d at 456 (Barrett, J., dissenting). Given the absence of any historical indications that the founding generation contemplated the dispossession of all criminals, the latter interpretation is the more reasonable one, under which "the catchall phrase limiting the rights of individuals who pose a 'real danger of public injury' would be an effort to capture non-criminals whose possession of guns would pose the same kind of danger as possession by those who have committed crimes" namely, "a subset of crimes" involving "real danger of public injury." Id. (emphasis in original).

¶88 Of course, none of the limiting language proposed by any of these states' conventions appears in the Second Amendment. Id. This omission provides further textual proof that Second Amendment rights extend to every citizen, unless

18

restricted or removed for constitutionally-permissible reasons, which were uniformly rooted in concerns over dangerousness rather than general criminality. An examination of legislation in the American colonies predating the Second Amendment confirms this understanding. Concerned at the time with impending threats of English tyranny, the founding generation dispossessed individuals "who refused to pledge their loyalty to the Revolution, state, or nation." Binderup, 836 F.3d at 368 (Hardiman, J., concurring). Early Americans grounded their disarmament laws in quelling the "potential danger" posed by those who were disloyal, although they had committed no crime. Id. (citing Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200 (5th Cir. 2012)). At its core, the founding generation enacted these types of laws in order to "deal with the potential threat coming from armed citizens who remained loyal to another sovereign." Kanter, 919 F.3d at 457 (Barrett, J., dissenting) (quoted source omitted). These laws were not concerned with categorical distinctions based upon classes of criminals nor an individual's prior legal transgressions. Instead, they were designed to disarm individuals who posed a danger to society or, particularly in the founding era, a danger to the Revolution.

¶89 The same can be said about other laws enacted close in time to the founding. In particular, colonial legislatures passed statutes disarming Native Americans and slaves, purportedly out of fear of their armed "revolt" or other threats to "public safety." Id. at 458 (citing Joyce Lee Malcolm, To

19

Keep and Bear Arms 140-41 (1994)). Similarly, a distrust of Catholics prompted their disarmament "on the basis of allegiance" rather than faith. Id. at 457 (citing Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 157 (2007)). Although these laws would not survive a contemporary constitutional challenge, they nevertheless reveal the limits the founding generation contemplated for the right to keep and bear arms. The earliest Americans enacted them out of a fundamental fear of rebellion and public unrest, rather than as a forfeiture for criminal conduct. Constitutionally permissible disarmament is circumscribed by founding-era conceptions of a person's danger to society. In other words, "Heller instructs that the public understanding of the scope of the right to keep and bear arms at the time of the Second Amendment dictates the scope of the right today." Binderup, 836 F.3d at 367 (Hardiman, J., concurring).

¶90 In contrast to its meaning under Wis. Stat. § 941.29(1m), the word "felon" signified something quite different in the founding era. "At early common law, the term 'felon' applied only to a few very serious, very dangerous offenses such as murder, rape, arson, and robbery." Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1362 (2009). Over time, English Parliament began classifying more and more crimes as "capital offenses, some involving trivial thefts." Id. In colonial America, capital punishment was rare.

Kanter, 919 F.3d at 459 (Barrett, J., dissenting). Although a definitive understanding of what "felony" meant at that time remains elusive, a felony conviction unaccompanied by a life sentence typically resulted in a suspension of rights, rather than a permanent loss. Id.

¶91 Contrary to this overarching distinction between dangerous and non-dangerous individuals, some courts——and the State in this case——claim that the original meaning of the Second Amendment is rooted in a "virtuous citizenry" test. See, e.g., United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010) (citing with approval cases concluding that the right to bear arms was tied to the concept of a virtuous citizenry); United States v. Carpio-Leon, 701 F.3d 974, 979-80 (4th Cir. 2012) ("[F]elons were excluded from the right to arms because they were deemed unvirtuous."). According to this theory, the "right to arms was inextricably and multifariously linked to that of civic virtue . . . ." Kates & Cramer, supra, at 1359. Because criminals have engaged in unvirtuous conduct, purveyors of this notion posit that the Framers intended to limit their Second Amendment liberties outright, irrespective of dangerousness. See id. at 1360.

¶92 The majority alludes to this concept in a selective but incomplete citation to Heller, proclaiming that "the Second Amendment secures 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" Majority op., ¶21 (citing Heller, 554 U.S. at 635). Of course, far from restricting the right to keep and bear arms to a select segment

21

of society, to be exercised only for self-defense in the home, <u>Heller</u> instead declared that the Second Amendment right "belongs to all Americans" and broadly protects all "defensive purposes" regardless of whether the right is exercised within or beyond the home. 554 U.S. at 581, 602. This is the core right protected by the Second Amendment. The full context of the phrase from <u>Heller</u> cited by the majority shows that the Second Amendment is neither limited to "law-abiding" citizens nor confined to the "defense of hearth and home." Instead, the <u>Heller</u> Court reserved other applications of the Second Amendment for "future evaluation" while declaring that the Constitution "surely elevates above all other interests" the practice prohibited by the District of Columbia's handgun ban: "the right of law-abiding citizens to use arms in defense of hearth and home." <u>Id.</u> at 635. While this may constitute a particularly sacrosanct exercise of the Second Amendment right, at its core, the Second Amendment protects far more, and nothing in an original understanding of its text remotely suggests a non-violent criminal forfeits his Second Amendment right altogether.

¶93 In suggesting that the Second Amendment right belongs only to the law-abiding, the virtuous citizen standard is deeply intertwined with the collective rights interpretation of the Second Amendment, a reading <u>Heller</u> debunked as contrary to the

22

original meaning of the Second Amendment.[8] While "history does show that felons could be disqualified from exercising certain rights——like the rights to vote and serve on juries——because these rights belonged only to virtuous citizens[,]" such "virtue exclusions are associated with civic rights——individual rights that 'require[] citizens to act in a collective manner for distinctly public purposes.'" Kanter, 919 F.3d at 462 (Barrett, J., dissenting) (citation omitted). In contrast, the Second Amendment "unambiguously" protects "individual rights," not collective rights. Heller, 554 U.S. at 579. Given the Supreme Court's rightful rejection of the collective rights theory as applied to the right to keep and bear arms, the virtuous citizenry standard is entirely misplaced in construing the Second Amendment, particularly considering that its exercise is "intimately connected with the natural right of self-defense, and not limited to civic participation." Kanter, 919 F.3d at 464 (Barrett, J., dissenting).

¶94 The virtuous citizenry standard lacks any foundation in the historical backdrop to the Second Amendment. For one,

---

[8] The "virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-Heller interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who rejected the view that the Amendment confers an individual right and instead characterized the right as a 'civic right . . . exercised by citizens, not individuals . . . who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia.'" Binderup v. Atty. Gen. U.S. of America, 836 F.3d 336, 371 (3rd Cir. 2016) (Hardiman, J., concurring) (citing Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 491-92 (2004)).

23

"this supposed limitation on the Second Amendment stems from a misreading of an academic debate about 'ideological interpretation.'" Binderup, 836 F.3d at 371 (Hardiman, J., concurring) (citation omitted). In advancing this theory, certain scholars divorced themselves from more authoritative historical sources and wrongly focused upon whether or not particular Founders were civic republicans or libertarians. Id.; see also Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 492 (2004). This debate over ideology may inform the Framers' motivations for constitutionally preserving the right to keep and bear arms, but it has nothing to say about the scope of the right or any constitutionally permissible restrictions on its exercise.

¶95 If the virtuous citizenry test was historically valid, we would expect to discover 18th and 19th century laws depriving felons of their Second Amendment rights——a class of people that would certainly be categorized as "unvirtuous." But that is simply not the case. In the decades following ratification, "nine states enacted their own right-to-arms provisions in their constitutions," and none of them placed restrictions on criminals. Kanter, 919 F.3d at 463 (Barrett, J., dissenting) (citing Eugene Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. L. & Pol. 191, 208-09 (2006)). The historic record affords the virtuous citizenry test no credibility; in fact, there is "no historical evidence on the public meaning of the right to keep and bear arms indicating

24

that 'virtuousness' was a limitation on one's qualification for the right." Binderup, 836 F.3d at 373 (Hardiman, J., concurring). Instead, as outlined above, the original meaning of the Second Amendment contemplates curtailing the rights of only those individuals who pose a danger to the public.

¶96 The majority's rationale for sanctioning the blanket revocation of felons' Second Amendment right is even weaker than the "virtuous citizen" justification. Wisconsin's citizens should be alarmed by the breathtaking scope of the majority's conclusion that "it is reasonable for the State to want to keep firearms out of the hands of those who have shown a willingness to . . . break the law"[9] considering the "cancerous growth since the 1920s of 'regulatory' crimes punishable by more than a year in prison, as distinct from traditional common-law crimes. The effect of this growth has been to expand the number and types of crimes that trigger 'felon' disabilities to rope in persons whose convictions do not establish any threat that they will physically harm anyone, much less with a gun." Marshall, supra, at 697. As but one example of how the ever-expanding regulatory state may eventually make felons of us all, recall that whomever fails "to comply with any record-keeping requirement for fish" is guilty of a Class I felony under Wis. Stat. § 29.971(1)(c) (provided the fish are worth more than $1,000).

¶97 Only months ago, a slim majority of this court invalidated Executive Order 28, which had been issued by a single, unelected bureaucrat who in the name of the COVID-19

---

[9] Majority op., ¶48.

25

pandemic "claimed the authoritarian power to authorize the arrest and imprisonment of the people of Wisconsin for engaging in lawful activities proscribed by the DHS secretary-designee in her sole discretion." Wisconsin Legislature v. Palm, 2020 WI 42, ¶81, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca Grassl Bradley, J., concurring). Had the court ruled otherwise, would a majority of this court deem it "reasonable" to keep firearms out of the hands of those who disobeyed a cabinet secretary's decree to "all people within Wisconsin to remain in their homes, not to travel and to close all businesses that she declares are not 'essential'"? Palm, 391 Wis. 2d 497, ¶1. If so, the court's decision in this case would give the State license to disarm a substantial portion of the citizens of Wisconsin based on their "willingness to break the law" as unilaterally decreed by an unelected bureaucrat, for the unspeakable crimes of opening their "non-essential" businesses or washing their hands for less than 20 seconds. Palm, 391 Wis. 2d 497, ¶87 (Kelly, J., concurring). As a general proposition, the judiciary should defer to the policy choices of the legislative branch, but when those policy choices unconstitutionally infringe the people's fundamental rights, it is the duty of the judicial branch to say so. "[T]o make an individual's entitlement to the Second Amendment right itself turn on the predilections of the legislature . . . is deference the Constitution won't bear." Binderup, 836 F.3d at 374 (Hardiman, J., concurring).

¶98 Underlying the founding generation's reverence for the fundamental right to keep and bear arms was the understanding

26

that "[o]ne of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms." Heller, 554 U.S. at 608-09 (citing Joseph Story, A Familiar Exposition of the Constitution of the United States § 450 (reprinted 1986)). Embodying "the first law of nature" and representing "the true palladium of liberty," the people's Second Amendment right deserves far more respect than the legislature or the majority give it.

## IV

¶99 Whether applying strict scrutiny or some lesser standard, Wis. Stat. § 941.29(1m) is unconstitutional as applied to Roundtree, under the original meaning of the Second Amendment. Even if a compelling state interest underlies the statute, it lacks any narrow tailoring tied to the protection of the public and therefore the statute unconstitutionally limits Roundtree's right to keep and bear arms. Nor does § 941.29(1m) bear a substantial relation to an important governmental objective. Section 941.29(1m) bans every felon from possessing a firearm in this state, regardless of whether he poses a danger to the public. If the compelling/important state interest is protecting the public from dangerous felons, then the statute must actually do so. Instead, § 941.29(1m) disarms every citizen convicted of a felony offense, regardless of the nature of the crime involved, and irrespective of whether the offender is dangerous. To survive either strict or intermediate scrutiny, § 941.29(1m) would need to reach only dangerous

27

felons, as determined by the crime committed or the offender's personal characteristics. Under the intermediate level of scrutiny applied by the majority, in order to assess "the strength of the government's justification for restricting"[10] Roundtree's Second Amendment rights——public safety——the court must ask whether the public is safer now that Roundtree is completely and permanently disarmed.[11]

¶100 Roundtree committed a non-violent felony when he failed to pay child support nearly 13 years ago. The sentencing court did not send Roundtree to prison, indicating he was not deemed dangerous to the public. The record shows he made full restitution by paying what he owed and he did not reoffend. Roundtree has never been convicted of a violent crime and the State did not introduce any evidence otherwise suggesting that Roundtree poses a danger to society. Abandoning any pretense of conducting an individualized inquiry into the application of Wisconsin's felon disarmament statute to Roundtree specifically, the majority instead resorts to nearly decade-old data from the Wisconsin Department of Corrections indicating that 21.4 percent of those who committed "public order offenses" and spent time in prison later committed a violent crime. Majority op., ¶51. Of course, Roundtree was never incarcerated for his offense, so the only foundation for the majority's declaration of a "substantial

---

[10] Majority op., ¶40 (citation omitted).

[11] C. Kevin Marshall, Why Can't Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 696 (2009) ("Is the public safer now that Martha Stewart is completely and permanently disarmed?").

28

relation" between disarming nonviolent felons and "preventing gun violence" collapses when applied to Roundtree and others like him who never spent time in prison.

¶101 Even if Roundtree had spent time in prison, the premise that the State may permanently disarm all felons in order to protect the public, based on data showing that 21.4 percent of felons incarcerated for "public order offenses" later commit violent ones, presents a specious justification for infringing a fundamental constitutional right. Unlike Roundtree who was sentenced to probation, Martha Stewart spent five months in jail. Marshall, supra, at 695. "Is the public safer now that Martha Stewart is completely and permanently disarmed?" Id. at 696. Of course not, and "it is at least curious how Martha Stewart could merit anyone's concern." Id. at 735. The same could be said for Roundtree, since the State produced no evidence indicating that Roundtree presents a danger to society warranting removal of his Second Amendment right.

¶102 The Founders never understood legislatures to have the power to strip non-dangerous criminals of their Second Amendment rights, which the Constitution protects for all Americans. Absent statutory language narrowly tailoring the disarming of felons based upon their perceived dangerousness, or even bearing a substantial relationship to the ostensible governmental objective of protecting society, Wis. Stat. § 941.29(1m) cannot survive any level of constitutional scrutiny as applied to Roundtree, much less the hapless possessor of fish who runs afoul of the record-keeping requirements of Chapter 29 of the

29

Wisconsin Statutes. Without the predictive powers of the mutant precogs from "The Minority Report,"[12] permanently revoking the Second Amendment rights of those who fail to meet their familial financial obligations or carelessly keep their fish records, bears no relationship to "public safety" or "the prevention of gun violence," majority op., ¶53, much less a substantial one.

¶103 Of particular constitutional concern, Wis. Stat. § 941.29(1m) <u>permanently</u> disarms Roundtree and other non-dangerous felons, who have no avenue for having their Second Amendment rights restored. In contrast, a convicted felon only temporarily loses his right to vote during his incarceration and extended supervision. Wis. Stat. § 6.03(1)(b). Once he completes the term of his sentence, the State restores his voting rights. Wis. Stat. § 304.078(3). Similarly, convicted felons regain their right to serve as jurors after their civil rights have been restored. Wis. Stat. § 756.02. Reviving these <u>collective</u> rights for felons while permanently dispossessing them of their <u>individual</u> and fundamental Second Amendment rights turns the constitutional order on its head.

---

[12] "<u>The Minority Report</u> is a 1956 science fiction novella by American writer Philip K. Dick, first published in <u>Fantastic Universe</u>. In a future society, three mutants foresee all crime before it occurs. Plugged into a great machine, these 'precogs' allow a division of the police called Precrime to arrest suspects before they can commit any actual crimes." The philosophical premise underlying the novella "question[s] the relationship between authoritarianism and individual autonomy." The story was adapted into the 2002 film "Minority Report," directed by Steven Spielberg. https://en.wikipedia.org/wiki/The_Minority_Report.

\* \* \* \* \*

¶104 To the extent Wis. Stat. § 941.29(1m) permanently deprives Roundtree of his fundamental, individual right to keep and bear arms, with no showing of his dangerousness to society, this statute is unconstitutional as applied to Roundtree.  While the wisdom of the legislature's policy choices may be fiercely debated, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table."  Heller, 554 U.S. at 636.  Permanent dispossession of felons' Second Amendment rights is one of them.  "[A]n act of the Legislature repugnant to the Constitution is void."  Marbury, 5 U.S. at 177.  As applied to felons who pose no danger to society, Wisconsin's felon dispossession statute is repugnant to the Constitution, and therefore void.  Because the majority allows statutory law to override the fundamental constitutional right to keep and bear arms, I dissent.

¶105 BRIAN HAGEDORN, J. *(dissenting)*. The Second Amendment prohibits the government from infringing upon the individual and fundamental right to keep and bear arms. Wisconsin, however, makes possession of firearms a crime for any person convicted of a felony. Wis. Stat. § 941.29(1m)(a) (2017-18).[1] This complete ban on possessing firearms never expires; it lasts for a lifetime. It matters not whether the felony was for making unlawful political contributions (Wis. Stat. § 11.1401(1)(a)), legislative logrolling (Wis. Stat. § 13.05), armed robbery (Wis. Stat. § 943.32(2)), or here, delinquent child support (Wis. Stat. § 948.22(2)).

¶106 In 2003, Leevan Roundtree was convicted of a felony for failure to pay child support for more than 120 days. In 2015, a search warrant found him in possession of a firearm under his mattress at his home, leading to the charge currently before us on appeal. Roundtree asks this court to decide whether the Second Amendment permits the State to criminalize his possession of a firearm. The majority answers yes, reasoning that the State may disarm all those who have committed a felony of whatever kind. I disagree. I conclude that the original public meaning of the Second Amendment supports applying at least intermediate scrutiny to this type of restriction. This places the burden on the State to demonstrate that the law is constitutional as applied to Roundtree by proving a substantial relationship, a close fit, between

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

1

criminalizing gun possession for those convicted of any felony or of the felony of failure to pay child support and the State's interest in preventing gun-related violence. The State has come nowhere close to meeting its burden. I respectfully dissent.

## I. THE SECOND AMENDMENT

¶107 We begin by laying down the guiding principles of constitutional interpretation, and then apply those principles to the Second Amendment.[2]

### A. Principles of Constitutional Interpretation

¶108 In America, the people are sovereign. This is the bedrock principle of American government. Wis. Leg. v. Palm, 2020 WI 42, ¶172, 391 Wis. 2d 497, 942 N.W.2d 900 (Hagedorn, J., dissenting) ("Government has a morally legitimate claim to order and command not because it has the biggest guns or because it's always been that way, but because the people have given it that power."). When the people established our federal government, they granted it only a limited set of enumerated powers. United States v. Morrison, 529 U.S. 598, 607 (2000). States, meanwhile, retained broad and far-reaching police powers, covering the state's inherent power "to promote the general welfare," which "covers all matters having a reasonable relation

---

[2] Roundtree also challenges Wis. Stat. § 941.29(1m)(a) under Article I, Section 25 of the Wisconsin Constitution. However, he fails to develop this argument in any meaningful way, and we will not do so for him. Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35. Accordingly, this analysis focuses on the Second Amendment alone.

to the protection of the public health, safety or welfare." State v. Interstate Blood Bank, Inc., 65 Wis. 2d 482, 490, 222 N.W.2d 912 (1974).

¶109 Neither state nor federal power is without limitation, however. The people declared certain areas off limits. Many of these limits are listed in the federal Constitution's Bill of Rights, including the Second Amendment's protection of the right "to keep and bear Arms." U.S. Const. amend. II.

¶110 Initially, the Bill of Rights only applied against the federal government. Timbs v. Indiana, 139 S. Ct. 682, 687 (2019). Following the Civil War, however, the people decided that some of the limits on federal power should also constrain the exercise of state power. Id. To that end, the people adopted the Fourteenth Amendment which, among other things, provides that states may not "abridge the privileges or immunities of citizens of the United States" or "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Over time, the United States Supreme Court has construed the Fourteenth Amendment as incorporating most of the protections in the Bill of Rights against the States——the Second Amendment among them. McDonald v. City of Chicago, 561 U.S. 742, 750 (2010). Once incorporated, the amendment's "protection applies 'identically to both the Federal Government and the States.'" Timbs, 139 U.S. at 689 (quoting McDonald, 561 U.S. at 766 n.14). Therefore, no arm of Wisconsin government may infringe upon "the

3

right of the people to keep and bear Arms." U.S. Const. amend. II.

¶111 The Supreme Court's Second Amendment jurisprudence is sparse, establishing for our purposes only two controlling propositions: (1) the Second Amendment is incorporated against the States via the Fourteenth Amendment; and (2) the right the Second Amendment protects is an individual right, not a collective right. McDonald, 561 U.S. at 749-50; District of Columbia v. Heller, 554 U.S. 570, 595 (2008). While we are bound by these holdings, neither offers much assistance in this case. Several federal courts of appeals have opined on the intersection of the Second Amendment and felon-dispossession laws, but those decisions are merely persuasive, not binding.

¶112 In other words, this court is both free and duty-bound to do the job of a court——not just to compare and contrast other courts' opinions, but to explore the meaning of the Second Amendment and apply it afresh. Admittedly, this is a difficult task. But we are not without the tools to do the job. When the people enacted the Constitution, they used words with certain meanings, and those words were understood——and meant to be understood——by the public. Our job when reading and applying the Constitution is to learn how its words were understood by the public when they were written, what many call the "original public meaning."

¶113 The first task in this inquiry is, not surprisingly, to read the constitutional text taking into account its context and structure. The people who adopted it, after all, can be

4

presumed to have meant what their words conveyed when they wrote and adopted them. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 188 (1824) ("[T]he people who adopted [the Constitution], must be understood to have employed words in their natural sense, and to have intended what they have said."); see also Joseph L. Story, 1 Commentaries on the Constitution of the United States § 451 (1833) ("In the first place, then, every word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it.").

¶114 However, sometimes the meaning of the text is difficult to determine. This can be especially true with the passage of time. When that is the case, we look to the historical record for clues as to what the public understood the provision to mean when it was adopted. Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶28 n.10, 393 Wis. 2d 38, 946 N.W.2d 35 ("[W]here necessary, helpful extrinsic aids may include the practices at the time the constitution was adopted, debates over adoption of a given provision, and early legislative interpretation as evidenced by the first laws passed following the adoption."). The meaning of the text as enlightened by the historical record is no less binding because the historical inquiry is still directed toward discovering what the words were understood to convey when written. See McPherson v. Blacker, 146 U.S. 1, 27 (1892); Heller, 554 U.S. at 592. In other words, the original public meaning controls, even when we have to work a little to find it.

5

¶115 Judicial application of the original public meaning is sometimes quite easy. A President, for example, must be at least 35 years old. U.S. Const. art. II, § 1, cl. 5. Putting that into practice isn't difficult and requires nothing more than analyzing and applying the text. But other provisions, especially the more vaguely worded protections in the Bill of Rights, often demand some legal framework or test that enables a court to apply the law to the facts of a case. See, e.g., Ezell v. City of Chicago, 651 F.3d 684, 700-04 (7th Cir. 2011); see also Bartlett v. Evers, 2020 WI 68, ¶¶256-59, 393 Wis. 2d 172, 945 N.W.2d 685 (Hagedorn, J., concurring). Our law is replete with these implementing doctrines that give effect to various constitutional provisions.[3]

¶116 A proper legal test must implement and effectuate the original public meaning of the law. Bartlett, 393 Wis. 2d 172, ¶259 (Hagedorn, J., concurring) (explaining that an appropriate implementing doctrine is one "that gets us to the heart of the constitution's meaning"). This is not a license for the judiciary to engage in policy-driven constitutional line drawing. Rather, an implementing doctrine must be a faithful

---

[3] For example, the Fourth Amendment protects against unreasonable searches and seizures. This text is put into practice with the default warrant requirement and analytical categories such as reasonable suspicion, probable cause, and exigent circumstances. E.g., Terry v. Ohio, 392 U.S. 1, 27 (1968); Payton v. New York, 445 U.S. 573, 590 (1980). Most challenges under the equal protection clause are analyzed under a rational basis test. E.g., Gregory v. Ashcroft, 501 U.S. 452, 470 (1991). But government discrimination on the basis of race is subject to strict scrutiny. E.g., Loving v. Virginia, 388 U.S. 1, 11 (1967). And the list could go on.

extension of the lines ascertainable in the provision's text and history.  Id., ¶¶257-59.

¶117 With these principles in mind, we turn to the text and history of the Second Amendment, followed by a discussion of its proper application.

## B.  The Text

¶118 The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const., amend. II.

¶119 As more extensively discussed in Heller, the Second Amendment contains both a prefatory and operative clause, the latter of which protects the right to keep arms and to bear them.  Heller, 554 U.S. at 576-78.  Historical evidence makes clear that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen and everyone else."  Id. at 583.  Similarly, to "bear" arms meant to carry, as it is understood today.  Id. at 584.

¶120 The text's reference to "the right of the people" reflects an understanding that this right——like the Founders' understanding of many protections in the Bill of Rights——did not create a new right unknown to the people.  Id. at 592.  Rather, the Second Amendment presumes this right already existed and was held by the people.  Id.  The Second Amendment therefore called upon a right that had an ascertainable scope and substance, and gave it protection in our fundamental law.

7

¶121 By adopting the Second Amendment, then, the people prohibited the federal government from infringing their right to keep and bear arms to the same extent the right existed when the Second Amendment was ratified in 1791. As Heller explained, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." Id. at 634-35.

¶122 The text, however, leaves many questions unanswered. It does not readily reveal the nature of the right as it was originally understood, and therefore the power of the state to regulate matters touching its protections. Accordingly, we look to the historical record for further assistance.

## C. The History

¶123 In 1689 King William and Queen Mary assured Englishmen that they would never be disarmed. Heller, 554 U.S. at 593. Codified in the English Bill of Rights, the protection provided: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." Id. (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)). The English right to arms "has long been understood to be the predecessor to our Second Amendment." Id. This forerunner, and its understanding leading up to the adoption of the Second Amendment in 1791, is our starting point.

¶124 But our study of the historical record does not end there. As noted above, the Second Amendment does not operate

8

against the states directly; it does so by incorporation via the Fourteenth Amendment, which was ratified in 1868. Although this issue engenders some debate, the prevailing view is that "when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." Ezell, 651 F.3d at 702 (citing McDonald, 561 U.S. at 770-77). Thus, our study of the historical record does not conclude with the close of the Founding Era, but rather continues through the Reconstruction Era. Id. at 702-03.

### 1. A Positive Right

¶125 At its core, the historical record demonstrates that the Second Amendment protects the longstanding, natural right to self-defense.

¶126 From the outset, the English Bill of Rights made this point explicit by guaranteeing the right to "have Arms for . . . Defence." Heller, 554 U.S. at 593. Blackstone, reflecting on the English right, noted that it protected the "natural right of resistance and self-preservation" and "the right of having and using arms for self-preservation and defence." Id. at 594 (quoting 1 William Blackstone, Commentaries on the Laws of England 139-40 (1765)).

¶127 Across the Atlantic, after King George III tried to disarm American colonists, Americans "invoke[ed] their rights as Englishmen to keep arms." Id. It was in that context that a

9

New York newspaper said in April 1769 that "[i]t is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence." Id. (quoted source omitted). On the American conception of the right to keep and bear arms, Blackstone observed it was "without any qualification as to their condition or degree, as [was] the case in the British government." 1 William Blackstone, Commentaries on the Laws of England 143 n.40 (St. George Tucker ed. 1803).

¶128 In short, the central component of the Second Amendment is the longstanding, natural right to self-defense. Heller, 554 U.S. at 595. And, as Heller noted, this right extends "to the home, where the need for defense of self, family, and property is most acute." Id. at 628.

## 2. With Limitations

¶129 This core right, however, was not impervious to certain types of government regulation. Laws restricting the right to keep and bear arms were rare, but they were not unknown. Those that existed were largely aimed at persons or classes of people who might violently take up arms against the government in rebellion, or at persons who posed a more immediate danger to the public.

¶130 An early instance of this was in 1689, the same year the English Bill of Rights codified Protestants' right to possess arms. At that time, Catholics were deemed a threat to rebel against the Protestant crown and "were not permitted to

10

'keep arms in their houses.'" Heller, 554 U.S. at 582 (quoting 4 William Blackstone, Commentaries on the Laws of England 55 (1769)). A 1695 Irish law disarmed Catholics on the same basis. 7 Will. III ch. 5, § 3 (1695); see also Joseph G.S. Greenlee, The Historical Justifications for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 260 (2020). These class-based dispossessions of those feared to be disloyal to the crown, and therefore likely to take up arms against the crown, were renewed multiple times and persisted well into the 18th century. Greenlee, supra at 260-61.

¶131 The American colonies adopted similar laws disarming those they feared would use them to violent ends. In 1736, Virginia permitted constables to "take away Arms from such who ride, or go, offensively armed, in Terror of the People." Id. at 262 (quoting George Webb, The Office of Authority of a Justice of Peace 92-93 (1736)). And in 1756, during the French and Indian War, Virginia authorized the seizure of arms from Catholics out of fear they were sympathetic to the French cause and would take up arms against the colonies. Id. at 263. But even that law provided an exception "for the defense of his house or person." Id. (quoting 7 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia 37 (1820)). Maryland and Pennsylvania also enacted similar laws during the French and Indian War. Id.

¶132 The revolutionary years gave rise to related laws targeting those perceived as disloyal to the American cause and therefore at risk to take up arms in violence against it. In

11

1775, Connecticut prohibited anyone who defamed acts of Congress from keeping arms "until such time as he could prove his friendliness to the liberal cause." Id. at 268 (quoting G.A. Gilbert, The Connecticut Loyalists in 4 Am. Historical Rev. 273, 282 (1899)). One year later, the Continental Congress passed the Tory Act, which called for disarming those with "erroneous opinions, respecting the American cause."[4] Also that year, Congress recommended that the colonies disarm those "who are notoriously disaffected to the cause of America." 4 Journals of the Continental Congress, 1774-1789 205 (1906). And, at a minimum, Massachusetts, Pennsylvania, New Jersey, North Carolina, and Virginia all heeded the call, disarming those disaffected with or unwilling to take an oath of allegiance to the American cause. Greenlee, supra at 264-65.

¶133 Massachusetts' responded likewise to Shays' Rebellion a decade later. Beginning in August 1786, armed bands of western Bay Staters revolted against the federal government, attacking government properties and, on February 2, 1787, engaging a Massachusetts militia in a military confrontation. Id. at 268-69. In response to the violent rebellion, Massachusetts placed a variety of restrictions on those involved, including dispossession of their firearms for three years. 1 Private and Special Statutes of the Commonwealth of Massachusetts from 1780-1805 145-47 (1805). Notably, the law provided that arms given up be kept safe "in order that they may

---

[4] 4 Journals of the Continental Congress, 1775-1789 18-22 (1906); https://www.loc.gov/resource/bdsdcc.00801/?st=text.

12

be returned to the person or persons who delivered the same, at the expiration of the said term of three years." Id. at 147. The response to Shays' Rebellion epitomized the type of dispossession laws that existed during the Founding Era. They were aimed at those considered dangerous to the government during a time of war, and to a more limited extent, those considered dangerous to society.

¶134 Moving forward in time, the Reconstruction Era unsurprisingly reflects the prejudices of the age; most arms regulations targeted slaves and freedmen. At a minimum, Mississippi, Indiana, Maryland, Kentucky, North Carolina, and Delaware adopted such discriminatory laws. Greenlee, supra at 269 n.133. Before passage of the Fourteenth Amendment, Congress condemned these laws as a violation of the right to keep and bear arms in the Freedmen's Bureau Act and the Civil Rights Act, both of 1866. McDonald, 561 U.S. at 773-75. Ratification of the Fourteenth Amendment, which was widely viewed as constitutionalizing the Civil Rights Act of 1866, affirmed that states could not enact such discriminatory laws depriving persons of their constitutional rights. Id. at 775.

¶135 A Kansas law adopted in 1868, the same year the Fourteenth Amendment was ratified, is quite instructive. See Vos, 393 Wis. 2d 38, ¶64 ("Early enactments following adoption of the constitution are appropriately given special weight. This is because these enactments are likely to reflect the original public meaning of the constitutional text." (citation omitted)). It provides:

13

> Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state carrying on his person a pistol, bowie-knife, dirk, or other deadly weapon, shall be subject to arrest upon charge of misdemeanor, and upon conviction shall be fined a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

2 General Statutes of the State of Kansas 353 (1897). This law prohibits carrying arms: (1) while "not engaged in legitimate business"; (2) while intoxicated; or (3) for any individual "who has ever borne arms against" the United States. The first two restrictions are temporarily imposed in circumstances where individuals pose a danger of engaging in arms-related violence. The third restriction focuses on those who could be considered a threat to rebel against the government because they had done so in the past.

¶136 Notably the Kansas law prohibited only the "carrying," or "bearing," of arms, and not their possession. See supra ¶15. Therefore, it did not prohibit keeping arms in defense of one's home. The law also did not prohibit long guns, so it was not a complete prohibition on carrying weapons. Greenlee, supra at 271 (citing Parman v. Lemmon, 244 P. 232, 233 (Kan. 1926) (holding shotguns were not included in a similarly constructed statute)).

¶137 Although more historical clarity would be welcome, the record sufficiently establishes three key propositions regarding the original meaning of the Second Amendment. First, possession of firearms for self-defense and protection of one's home as an

14

individual right was widely accepted as the core of the Second Amendment's protections. And the relative paucity of laws prohibiting the possession or carrying of arms shows that this fundamental right was subject to only narrow bands of restrictions. Second, in at least some circumstances, states could permissibly restrict the right to keep and bear arms among those posing a danger to take up arms against the government and those posing a danger of engaging in arms-related violence.[5] Third, states had some authority to protect against dangerous individuals by way of class-based arms restrictions, even when not everyone in the class posed a clear danger of putting their arms to violent use.

¶138 Instead of this relevant historical evidence, the majority relies in large part on Heller's declaration that its opinion was not meant to cast doubt about "longstanding prohibitions on the possession of firearms by felons," which were presumed lawful. 554 U.S. at 626-27. This statement reflects that Heller was limited in its reach, and at least suggests not all such laws would be unconstitutional. But it also does not mean all such laws are constitutional (that question is reserved), nor does it establish that these laws are

---

[5] In addition to the examples provided, see United States v. Sheldon, in 5 Transactions of the Supreme Court of the Territory of Michigan 337, 346 (W. Blume ed. 1940) ("The constitution of the United States also grants to the citizen the right to keep and bear arms. But the grant of this privilege cannot be construed into the right in him who keeps a gun to destroy his neighbor.").

15

embedded into the original public meaning of the Second Amendment.

¶139 To be sure, felon-dispossession laws laws have been on the books for some time. But these laws are of 20th century vintage; they do not date back to the 18th or 19th centuries——the relevant time periods when the Second Amendment was ensconced as an individual constitutional right. See generally C. Kevin Marshall, Why Can't Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol'y 695 (2009) (examining the genesis of felon-dispossession laws). In fact, no historical evidence from the time the Second Amendment was adopted or incorporated against the states demonstrates broadscale dispossession of those who have committed certain crimes. Kanter v. Barr, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("[A]t least thus far, scholars have not been able to identify any such laws.").

¶140 The first felon-dispossession laws appeared in 1923, when New Hampshire, North Dakota, and California enacted laws forbidding felons from possessing pistols or revolvers. Greenlee, supra at 273 & n.160. In 1927, Rhode Island went a step further, barring those convicted of "a crime of violence" from possessing "any firearm." Id. at 274 (quoting 1927 R.I. Pub. Laws 257). The federal felon-dispossession law, meanwhile, was not enacted until the Federal Firearms Act of 1938, and even then it only applied to those who had committed certain violent crimes. Id. (citing Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250-51 (1938)). It was not until a 1961

16

amendment to the Federal Firearms Act that federal law first prohibited all felons nationwide from possessing firearms regardless of their underlying felony. Marshall, supra at 698 (citing An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961)). Wisconsin's felon-dispossession law, meanwhile, dates back only to 1981. Ch. 141, Laws of 1981.

¶141 Thus, the proliferation of these laws in the last century——far removed from the time the Second Amendment was enshrined in the Constitution and incorporated against the states——does not support the notion that these laws were understood to be permissible under the historic preexisting right to keep and bear arms. Such laws may be common today, but they do not enlighten the original public meaning of the Second Amendment.

¶142 Moreover, even if such a law had existed when the Second and Fourteenth Amendments were ratified, it is unclear how much help that would be. This is because the definition of a "felon" has greatly expanded since the Founding Era. See Kanter, 919 F.3d at 458-62 (Barrett, J., dissenting). In 1791, felonies were a narrow subset of crimes generally involving violence, many of which warranted the death penalty. Id. at 459. In contrast, today a person can become a felon for possessing certain fish illegally, falsifying a boat title, tax fraud, trafficking SNAP benefits, second offense dialing 911 for a nonexistent emergency, adultery, and perjury, just to name a

17

few.[6]  This reality seems to undercut any useful comparisons between the treatment of felons in 1791 and today.  But again, the historical record reveals no evidence from the Founding or Reconstruction Eras of the kind of broad felon-dispossession law like the one here.

¶143 Some have justified these laws by applying a so-called "unvirtuous citizenry" theory to the Second Amendment.  See Greenlee, supra at 275-85.  But this lacks any sound basis in historical fact, at least insofar as it would apply to today's felon-dispossession laws.

¶144 This theory is based on the accurate premise that founding-era felons could be disqualified from exercising certain civic rights because those rights belonged only to virtuous citizens.  See Thomas M. Cooley, A Treatise on the Constitutional Limitations 29 (1st ed. 1868) (noting that certain groups including "the idiot, the lunatic, and the felon, on obvious grounds," were "almost universally excluded" from exercising certain civic rights).  The problem with extending this theory to the Second Amendment, however, is that the right to keep and bear arms is not a "civic right" as that term was understood at the founding.  "Civic rights" were understood to be just that—rights related to the civic space, i.e., the community.  They included "individual rights that 'require[] citizens to act in a collective manner for distinctly public purposes.'"  Kanter, 919 F.3d at 462 (Barrett, J., dissenting)

---

[6] Wis. Stat. § 29.971(1)(c); § 30.80(3m); § 71.83(2)(b)(1); § 946.92(3)(a); § 256.35(10)(a); § 944.16; § 946.31(1).

18

(quoting Saul Cornell, A New Paradigm for the Second Amendment, 22 Law & Hist. Rev. 161, 165 (2004) (alteration in original)). Put differently, civic rights were those rights that empowered individuals to participate in the enterprise of self-governance——for example, the right to vote and to serve on juries. Id. Although these civic rights are "held by individuals," they are exercised "as part of the collective enterprise[s]" of self-governance or administration of justice. Id.

¶145 "Heller, however, expressly rejects the argument that the Second Amendment protects a purely civic right"; it protects a personal, individual right. Id. at 463 (citing Heller, 554 U.S. at 595 ("[T]he Second Amendment confer[s] an individual right to keep and bear arms.")). Because the right to keep and bear arms is not a civic right, it was not one of the rights that could historically be withdrawn from unvirtuous citizens. Indeed, there is "no historical evidence on the public meaning of the right to keep and bear arms indicating that 'virtuousness' was a limitation on one's qualification for the right——contemporary insistence to the contrary falls somewhere between guesswork and ipse dixit." Binderup v. Att'y Gen. U.S., 836 F.3d 336, 372 (3d Cir. 2016) (en banc) (Hardiman, J., concurring). In short, nothing in the text or history of the Second Amendment suggests the right to keep and bear arms could be removed by the government because the government deemed certain kinds of people unvirtuous.

19

¶146 Putting all this together, the historical record reveals the following regarding the original public meaning of the Second Amendment:

- The Second Amendment protects an individual right to keep and bear arms, especially in the defense of one's home;

- The government nevertheless was understood to have some ability to dispossess those who posed a danger of engaging in arms-related violence, often due to the risk of rebellion against the government;

- The government had some flexibility to disarm classes of people that posed a high risk of engaging in arms-related violence, even if individuals within that group might themselves not pose that danger; and

- No evidence supports the notion that felon-dispossession laws of the type at issue here are "longstanding" in the sense that they were contemplated when the right to keep and bear arms was safeguarded in the Constitution.

¶147 With this history in mind, we turn to the task of determining what legal framework or test best effectuates the Second Amendment's original public meaning.


D. An Implementing Doctrine

¶148 The application of these principles to the case before us requires some additional work. We need some judicially enforceable legal framework, or implementing doctrine, to

20

effectuate the constitutional provision's original public meaning. See supra ¶¶11-12.

¶149 For better or for worse, both federal courts and this court have created and adopted a tiers of scrutiny approach for evaluating some types of constitutional claims, especially those dealing with fundamental rights. Courts typically employ three tiers of judicial scrutiny: rational basis, intermediate scrutiny, and strict scrutiny——although these tiers sometimes work more like a sliding scale. Some have criticized this approach, not without merit.[7] But it has the virtue of putting the State to its proof when government attempts to regulate in areas the Constitution generally places outside the permissible bounds of regulation. While a better analytical tool may be devised, I accept this general construct in this case as a reasonable approach to the tricky problem of applying the text of the Constitution to various kinds of regulations touching the Second Amendment.

¶150 The United States Supreme Court has described the right to keep and bear arms as "among those fundamental rights necessary to our system of ordered liberty." McDonald, 561 U.S. at 778. This is consistent with its inclusion in the Constitution alongside other basic, pre-existing rights, including the freedoms of speech and religion. Generally, when the government restricts the exercise of rights deemed

---

[7] E.g., R. George Wright, What if All the Levels of Constitutional Scrutiny Were Completely Abandoned?, 45 U. Mem. L. Rev. 165 (2014) (advocating for abolition of the tiers of scrutiny).

fundamental, courts apply strict scrutiny. See, e.g., State v. Post, 197 Wis. 2d 279, 302, 541 N.W.2d 115 (1995). To survive a challenge, the "statute must further a compelling state interest and be narrowly tailored to serve that interest." Id. This burden rests on the state, not the challenger, and will rarely succeed.

¶151 An honest evaluation of the historical record regarding the Second Amendment, however, suggests strict scrutiny may not be appropriate for all regulations affecting the right it protects. We must match the doctrine to the scope of the right, and do so fairly. Prohibiting the possession of firearms altogether (especially in the home, as with Roundtree), cuts on its face right to the core of the Second Amendment right. That said, as best as I can discern from the historical evidence now available and summarized above, the state was nevertheless understood to have some authority to dispossess those who posed a danger of engaging in arms-related violence, and to do so in ways that were at least somewhat over- or under-inclusive.

¶152 As explained above, in the early English tradition of protecting the right to keep and bear arms, the government dispossessed an entire class of citizens based on the fear they would take up arms in violent rebellion against the Protestant crown. Surely, not every member of that class was predisposed to violence against the government, yet the class as a whole was restricted. Similarly, during the Founding Era, states broadly dispossessed those unwilling to take an oath to support the

22

cause of independence or otherwise sympathetic to British rule. Surely not everyone dispossessed under those laws presented a danger to public safety. Even the 1868 Kansas law that dispossessed anyone "who has ever borne arms against the government of the United States" cannot be said to be narrowly tailored in the context of the Civil War's aftermath. Former confederate soldiers presumably comprised a not insignificant class of people in Kansas, many of whom no longer would have posed a significant risk of violence simply by virtue of their past war efforts on behalf of the Confederacy.

¶153 As a starting point, then, the individual right to keep and bear arms, especially for the protection of one's home, is a fundamental and individual right that should be treated as such. But where there is a significant risk of arms-related violence, government retains some authority to restrict this right in ways that are not narrowly drawn; it may be over- or under-inclusive. Even though restrictions on the individual and fundamental right to keep and bear arms should ordinarily be subject to the highest judicial scrutiny, where the risk of gun-related violence is at stake, a slightly more deferential standard is appropriate and in keeping with the historical record.

¶154 Overly-generous deference to the government, however, would not be appropriate, especially since the text generally carves this right out as an impermissible area of government interference. The State must bear the burden in this context to show it is acting within constitutional limits, not the other

23

way around. When it comes to individuals who pose a danger of using a firearm to commit violence, however, strict scrutiny would seem to demand too much of the government in ways that do not capture the historical understanding of the right. A more appropriate analysis in this context is therefore a heightened scrutiny that still puts the government to its proof. Among the tools available, intermediate scrutiny best fits the bill.[8]

¶155 This approach has parallels in other areas of constitutional law. The Supreme Court applies intermediate scrutiny in some other circumstances where fundamental rights are implicated. In the First Amendment context, for example, the Court analyzes content-based restrictions on speech under strict scrutiny, but it applies a form of intermediate scrutiny to time, place, or manner regulations. Compare Texas v. Johnson, 491 U.S. 397, 412 (1989) (applying "the most exacting scrutiny" to a flag-burning statute) with United States v. O'Brien, 391 U.S. 367, 376-77 (1968) (applying intermediate scrutiny to uphold a defendant's conviction for burning a draft

---

[8] I endorse the majority of Justice Rebecca Bradley's dissent. However, I believe something less than strict scrutiny is more in keeping with the historical record——and therefore the original public meaning——for the type of restriction here. I also agree with the majority that our decision in Mayo v. Wisconsin Injured Patients and Families Compensation Fund, 2018 WI 78, 383 Wis. 2d 1, 914 N.W.2d 678, is inapplicable. Whatever analytical framework this court applies to equal protection cases under the Wisconsin Constitution is not, in my view, relevant to the framework we should employ to a claim under the Second Amendment to the federal Constitution. The original public meaning inquiry should dictate the appropriate legal test, regardless of the tests this court has employed in analyzing cases under different constitutional provisions.

card); McCullen v. Coakley, 573 U.S. 464, 486 (2014) (applying intermediate scrutiny to strike down a statute establishing "buffer zones" around facilities where abortions are performed).

¶156 Intermediate scrutiny places the burden on the State to show that the law at issue advances an important governmental interest and is substantially related to that interest. Gerhardt v. Estate of Moore, 150 Wis. 2d 563, 570-71, 441 N.W.2d 734 (1989). Even when the governmental interest is important, a law survives intermediate scrutiny only if it "does not burden substantially more [protected activity] than necessary to further those interests." Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 189 (1997). As now-Justice Barrett explained in her dissent in a case challenging this same Wisconsin law, the fit between the means and the ends must be a close one. Kanter 919 F.3d at 465 (Barrett, J., dissenting) ("'[A] very strong public-interest justification and a close means-ends fit' is required before [the defendant] may be constitutionally subject to the United States and Wisconsin dispossession statutes.").

¶157 It's worth emphasizing again that the burden when applying intermediate scrutiny is on the State to prove that the restriction advances an important interest and is substantially related to that interest. State v. Baron, 2009 WI 58, ¶14, 318 Wis. 2d 60, 769 N.W.2d 34. Every federal circuit to consider this matter agrees. See, e.g., Binderup, 836 F.3d at 353; Tyler v. Hillsdale Cnty. Sherriff's Dept., 837 F.3d 678, 693 (6th Cir. 2016); Heller v. District of Columbia, 670 F.3d 1244, 1258 (D.C.

25

Cir. 2011). As one court put it, "Strict and intermediate scrutiny (which we collectively refer to as 'heightened scrutiny' to distinguish them from the far less demanding rational-basis review) in effect set up a presumption of invalidity that the defendant must rebut." Hassan v. City of New York, 804 F.3d 277, 299 (3d Cir. 2015).

¶158 To summarize, where the government purports to act in ways the people have made clear in their constitution are outside the power granted, it is not the citizen who must show the government has acted unconstitutionally; it is the government that must demonstrate it has authority to do what it wishes. The Constitution reflects a presumption that government action in that zone is unlawful unless proven otherwise. The historic right to keep and bear arms is an individual and fundamental right. But the government has broader authority to restrict the right of those who would use arms for gun-related violence. Intermediate scrutiny——requiring a substantial connection to the important governmental interest——appears to best capture and secure the right in accordance with its original public meaning where government acts to protect against those who pose a danger of engaging in gun-related violence.

26

## II. APPLICATION

¶159 Roundtree challenges the constitutionality of Wisconsin's felon-dispossession law as applied to him.[9] Wisconsin Stat. § 941.29(1m)(a) provides: "Any person who possesses a firearm is guilty of a Class G felony if any of the following applies: (a) The person has been convicted of a felony in this state." "In this context, 'possess' . . . simply 'means that the defendant knowingly had actual physical control of a firearm.'" State v. Black, 2001 WI 31, ¶19, 242 Wis. 2d 126, 624 N.W.2d 363. Thus, for anyone convicted of a felony, § 941.29(1m)(a) operates as a lifetime ban on possessing firearms for self-defense, hunting, or any other ordinarily lawful purpose.

¶160 Roundtree brings two types of as-applied challenges. First, he argues that the State may not constitutionally dispossess him because the State has not shown that he personally poses a danger of engaging in gun-related violence. To support this challenge, Roundtree notes that his underlying felony, besides being nonviolent, occurred more than ten years ago, and that nothing he has done since suggests he poses any heightened risk of using a gun violently. But as we have discussed, the historical record suggests states may, consistent

---

[9] As we have explained before, "Challenges to the constitutionality of a statute are generally defined in two manners: as-applied and facial." Vos, 393 Wis. 2d 38, ¶37. Where "[a]s-applied challenges address a specific application of the statute against the challenging party," a facial challenge argues a statute "operates unconstitutionally in all applications." Id., ¶¶37-38.

27

with the right secured by the Second Amendment, dispossess some people on a somewhat overbroad class-wide basis. This is so even if some individual members of the class demonstrate their personal characteristics are inconsistent with a propensity for violence. Moreover, the challenged law criminalizes firearm possession for committing a felony, not for any of Roundtree's personal characteristics or other actions. In other words, the State has charged Roundtree with the crime of illegally possessing a firearm on one basis only——his prior felony conviction. Therefore, a challenge focused on Roundtree's personal risk of danger is off the mark.

¶161 Roundtree also argues the State may not dispossess him simply for belonging to either the class of people that committed any felony or the class of people that committed the same felony as him.

¶162 It is indisputable that public safety is a compelling governmental interest. See State v. Cole, 2003 WI 112, ¶23, 264 Wis. 2d 520, 665 N.W.2d 328. This interest is also well-illustrated in the history of the Second Amendment. Wisconsin Stat. § 941.29(1m)(a) therefore advances an important government objective.

¶163 Thus, we turn to the second prong of the intermediate scrutiny analysis: whether a law that dispossesses all felons is substantially related to the government's interest in preventing gun-related violence. And again, it's worth repeating that the State bears the burden to show a close and

28

substantial connection exists. The State tries to meet its burden by pointing us to two studies.[10]

¶164 The study most heavily relied on by the State is a 2016 study on recidivism prepared by the Wisconsin Department of Corrections. See Joseph R. Tatar II & Megan Jones, Recidivism After Release from Prison, Wisconsin Dep't of Corrections (August 2016) (hereinafter "DOC Study"). In its analysis, that study grouped all offenses into four categories: violent offenses, property offenses, drug offenses, and public order offenses. Id. at 14. Relevant here, the public order offense category included failure to pay child support (120 days+) in addition to crimes like operating while intoxicated, bail jumping, and operating a vehicle to elude an officer. Id. The State primarily relies on the study's conclusion that for those who committed a prior public order offense, 21.4 percent of recidivists in that category went on to commit a violent offense within three years. The remaining 78.6 percent of crimes committed within three years by recidivists whose original incarceration was for a public order offense committed non-violent offenses (either a drug offense, property offense, or another public order offense). Id.

_____

[10] The majority, in a block quote to the majority opinion in Kanter v. Barr, 919 F.3d 437, 449 (7th Cir. 2019), notes two additional studies that are not discussed by the State in its briefing. Majority op., ¶50. Because it is the State's burden to satisfy the substantial relationship prong of intermediate scrutiny, its failure to discuss these studies should preclude the majority's consideration of them. This court should not attempt to prove the State's case for it.

¶165 The State erroneously cites this study for a proposition it most certainly does not support. It characterizes the DOC Study as concluding that 21.4 percent of all those released after committing a public order offense went on to commit a violent offense. That's simply not what the study says, and it is an egregious error in light of its almost singular prominence in the State's effort to prove the requisite connection. This 21.4 percent is not the percentage of all public order offenders who, after release, committed violent crimes. Rather, it considers only those who committed another crime after committing a public order offense, and conveys the percentage of those public order offense recidivists who committed a violent crime. In other words, this 21.4 percent figure has nothing to do with, and makes no reference to, those who never recidivate after committing a public order offense. It should be obvious, then, that this statistic offers no assistance in establishing the relationship between past crime and a person's risk to commit gun-related violent crime in the future, which is the core inquiry of the intermediate scrutiny analysis.

¶166 The second study offered by the State surveys "5,923 authorized purchasers of handguns in California in 1977," 3,128 of whom had at least one prior misdemeanor conviction at the time of purchase. Garen J. Wintemute et al., Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns, 280 J. Am. Med. Ass'n 2083, 2083 (1998) (hereinafter

30

"Wintemute Study"). Specifically, the State points to that study's conclusion that "even handgun purchasers with only 1 prior misdemeanor conviction and no convictions or offenses involving firearms or violence were nearly 5 times as likely as those with no prior criminal history to be charged with new offenses involving firearms or violence." Id. Consider me unsurprised that people with criminal records who purchase handguns are more likely to commit future crime than those without a criminal record. But this correlation hardly demonstrates the close and substantial relationship required to justify this law. While those with a prior criminal record are surely more likely to commit future crime, the vast majority of people in the study who had prior criminal records did not commit a new violent offense. And the State must demonstrate that dispossessing the entire class that it chose will substantially further the State's efforts to remediate the risk of gun-related violence.[11] This study falls far short of demonstrating why those convicted of illegal possession of certain fish, tax fraud, or failure to pay child support should be dispossessed in the interest of preventing gun-related violent crime.

¶167 The State's correlation-centric reasoning——that Wis. Stat. § 941.29(1m)(a) substantially furthers the fight against gun-related violence simply by virtue of a correlation between past crime of any sort and future violent crime——does not meet

_____

[11] Importantly, the Wintemute Study does not actually analyze felons as a class because generally, felons will not be authorized handgun purchasers.

31

the mark. Playing this logic out further, suppose those who previously declared bankruptcy are modestly more likely to commit violent crime in the future?[12] Or those who do not have a bachelor's degree by the time they are 25?[13] How about those who were born out of wedlock,[14] or who fall below the poverty line?[15] Taking the State's argument on its face, dispossession laws barring these classes of persons (which impact not a small amount of the population) would survive as long as the State could prove that these features are correlated with an increased risk of committing violent crime with a firearm. Modest correlation, however, is simply not enough. And at best, that is all the State has here.

---

[12] Gercoline van Beek, Vivienne de Vogel & Dike van de Mheen, The Relationship Between Debt and Crime: A Systematic and Scoping Review, European J. of Probation, Oct. 2020, at 1 (showing "a strong association between debt and crime whereby debt is a risk factor for crime").

[13] Lance Lochner & Enrico Moretti, The Effect of Education on Crime: Evidence from Prison Inmates, Arrests, and Self-Reports, 94 The Am. Econ. Rev. 155, 156-57 (2004) ("Instrumental variable estimates reveal a significant relationship between education and incarceration . . . .").

[14] Todd D. Kendall & Robert Tamura, Unmarried Fertility, Crime, and Social Stigma, 53 J.L. & Econ. 185, 213 (2010) ("[A]n increase of 10 nonmarital births per 1,000 live births is associated with an increase in future murder and property crime rates between 2.4 and 4 percent.").

[15] U.S. Dep't of Justice, NCJ 248384, Household Poverty and Nonfatal Violent Victimization, 2008-2012, 1 (2014) ("Persons in poor households had a higher rate of violence involving a firearm (3.5 per 1,000) compared to persons above the FPL (0.8-2.5 per 1,000).").

¶168 Including all felonies in Wis. Stat. § 941.29(1m)(a)'s reach, no matter how violent and no matter how serious, is "wildly overinclusive." Kanter, 919 F.3d at 466 (Barrett, J., dissenting). It is an extraordinarily broad class that lacks a substantial relationship to the harm it seeks to remedy. Id. The fit between means and ends must be close——not perfect, but close. The State's evidence is far from showing that dispossessing all felons forever bears a close or substantial relationship to remediating the danger of gun-related violence.

¶169 If the class of all felons is too broad, perhaps the State could nonetheless show that criminalizing possession of firearms based on the particular underlying felony survives constitutional scrutiny. But the State does not even purport to argue that those who have failed to pay child support or committed other analogous crimes pose any risk of committing gun-related violence as a consequence of their underlying felony, nor do its studies support that conclusion. The State therefore fails to meet its burden of proof here as well.

¶170 The important goal of protecting against gun-related violence does not seem to be furthered by dispossessing those who have not committed a violent act with a gun, and indeed have not committed a violent act at all. The State does not meet this challenge head on; it has not met its burden to prove a close and substantial relationship between the means and ends of the prohibition. Accordingly, Roundtree's conviction for possession of a firearm, a criminal prohibition triggered

because he was convicted of failure to pay child support for 120 days, violates the Second Amendment and is unconstitutional.

## III. CONCLUSION

¶171 We are bound to interpret and apply the Constitution as written. A careful study of the history surrounding the right to keep and bear arms as protected by the Second Amendment demonstrates that while the right to keep arms in the home for self-defense is within the core of the right, some class-based restrictions on firearm possession are permissible to protect against the danger of gun-related violence. Felon-dispossession laws may be permissible under this historical protection, but only where the State shows the restriction substantially advances the State's interest in protecting against gun-related violence. Here, however, the State did not carry its burden to show that Wisconsin's dispossession law satisfies this standard as applied to Roundtree. Therefore, his conviction violates the Second Amendment. I respectfully dissent.